𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

MANSS-OWENS COMPANY V. H. S. OWENS & SON.

January 20, 1921.

1. CONTRACTS.—*Contract Complete—Although A Future Formal Written Contract is Contemplated.*—The mere fact that a formal written contract was contemplated by the parties does not necessarily show that no binding agreement has been entered into. If the parties are fully agreed, there is a binding contract, notwithstanding the fact that a formal contract is to be prepared and signed. Of course, this is not true if the parties expressly stipulate that the contract is not to be binding until executed in a more formal manner, or if all of the terms of the contract are not substantially agreed to.

2. CONTRACTS.—*Contract Complete—Although a Future Formal Written Contract is Contemplated—Case at Bar.*—In the instant case the letters and telegrams between the parties, fairly construed, expressed all the terms of an agreement by which plaintiffs undertook to sell the goods of defendant in a certain territory, and defendant undertook to make certain advances to the plaintiffs and pay certain commissions upon the sales.

   *Held:* That this constituted a binding contract, even though there was an understanding that the agreement should thereafter be expressed in a formal writing.

3. CONTRACTS.—*Certainty—Validity of Contracts.*—The law does not favor, but leans against, the destruction of contracts because of uncertainty.

4. CONTRACTS.—*Certainty—Validity of Contracts—Difference as to Construction.*—Contracts are not invalid merely because the parties differ as to the construction of particular language employed by them in expressing the contract. Where there is a difference of opinion as to the meaning of the language, the parties may seek the aid of a court to construe it, but such a difference has never been held to invalidate a contract, unless the provision is of primary importance affecting the substance of the contract, and is so vague and indefinite as to make it impossible to determine its meaning, or the substantial rights of the parties, thereunder.

5. CONTRACTS.—*Certainty—Letters and Telegrams—Case at Bar.*—In the instant case an agreement by letters and telegrams between

plaintiffs and defendant to enter into a contract by which plaintiffs were to sell defendant's goods on commission, within a certain territory, was sufficiently clear as to all of its substantial terms to justify plaintiffs' claim for damages arising out of the breach of the contract by the defendant.

6. DAMAGES.—*Breach of Contract—General Rule.*—The damages recoverable for breach of contract are such as may fairly and reasonably be considered as arising naturally—that is, according to the usual course of things—from the breach of the contract itself, or such as may reasonably be supposed to have been contemplated by both parties at the time they made the contract, as the probable result of the breach of it.

7. DAMAGES.—*Breach of Contract—Profits.*—While it is true that speculative and conjectural profits cannot be recovered as damages for breach of contract, damages which can be proved with reasonable certainty, and which are the direct result of the breach, are not speculative and conjectural and may be recovered, and damages claimed from the loss of the right to represent a manufacturer in a certain territory are the natural and direct result of breach of the contract by the manufacturer.

8. DAMAGES.—*Uncertainty as to the Amount.*—When it is certain that substantial damage has been caused by the breach of a contract, and the uncertainty is not whether there have been damages, but only as to their true amount, there can rarely be any good reason for refusing all damages due to the breach merely because of that uncertainty.

9. DAMAGES—*Future Profits.*—Nearly all commercial contracts are entered into in contemplation of future profits. As such profits are prospective, they must be uncertain and problematical, but the person injured is not to be deprived of all remedy. He has the right to prove the nature of his contract, the circumstances surrounding and following its breach, and the consequences naturally and directly traceable thereto; and it is for the jury, under proper instructions, to determine the compensation to be awarded for the breach. That compensation should be the value of the contract.

10. DAMAGES.—*Breach of Contract for Exclusive Right to Sell Goods of Manufacturer.*—Where defendant, a manufacturer, entered into a contract with plaintiffs by which plaintiffs were to have the exclusive right to sell defendant's goods in certain territory upon commission, upon breach of the contract by the defendant, plaintiffs were entitled to recover the value of their contract. The only practical way to determine this value was to introduce evidence as to the probable amount of sales which

they would have made if they had been allowed to perform their contract, and the best way to make an intelligent estimate of this value was to consider the extent of the territory and the past experience of the plaintiffs in selling goods of a similar character in that territory.

Error to a judgment of the Circuit Court of the city of Newport News in an action of assumpsit. Judgment for plaintiffs. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Lett & Massie,* for the defendants in error.

*Swink & Fentress,* for the plaintiff in error.

PRENTIS, J., delivered the opinion of the court.

H. S. Owens & Son, a co-partnership, hereinafter called the plaintiffs, recovered of the Manss-Owens Company, a corporation of Cincinnati, Ohio, engaged in the manufacture of shoes, a judgment for $2,600 as damages for an alleged breach of contract.

The Manss-Owens Company alleges two errors: First, that the court erred in construing the evidence as showing that a contract existed, and in refusing to instruct the jury that this evidence is insufficient to prove the contract; and, secondly, that the verdict should have been set aside because there was not sufficient evidence to support it, claiming that the damages, if any, are remote and speculative.

We must first determine, then, whether or not there was a contract. There was no conflict in the evidence, and the result depends upon the correspondence between the parties, all of which must be considered in order to reach a proper conclusion. This correspondence commences with a letter of May 16, 1918, from the plaintiff to the Manss-Owens Company, which, omitting the formal parts, reads thus:

24

"We had some correspondence with you last season relative to selling your line in Virginia and North Carolina and at the last moment you wrote us that you could not give us the State of North Carolina and we could not use them unless that State was included. Please let us know if you contemplate making any changes in North Carolina. If so, we would like to take on that State with Virginia and part of Maryland.

"We would want two sets of samples and want them by August 15th. We have an established business on men's shoes of around two hundred thousand dollars a year and we see no reason why we could not sell one hundred thousand dollars a year for your line and we know it is almost impossible for you to get that much business in those two States the way you are working them.

"Please give this letter your earliest attention, and oblige."

To which the Manss-Owens Company, on May 22, replied as follows:

"We have yours of the 15th and wish to say that the writer was in Norfolk the very day you wrote your letter and is very sorry he did not get an opportunity to see you but was working with a customer until just a few minutes before time to catch the boat.

"If you could give us $100,000.00 worth of business out of the three States you mention we would be very glad to enter into the arrangements you suggested.

"If it is possible for you to do so, we would like to have you come to the factory at your convenience and discuss the matter in detail as we expect to start our samples early this season and wish you would come as soon as possible so that we may get a line on about what you will need in the territory mentioned."

Then May 24, the plaintiffs wrote:

"In reply to your letter of the 22nd. We regret very much that your Mr. Owens did not call to see us while he was in

Norfolk. You perhaps would have been more interested in letting us have your line. We have no doubt that we could sell one hundred thousand dollars a year for you and perhaps more. You have a line of women's shoes in connection with your men's that would be a valuable asset to our sales inasmuch as the writer has a large following personally on women's shoes.

"We are selling the output of a little factory of Lynn, Mass., who make women's McKays and we have sold so far this season for them since March 1st a little over one hundred thousand dollars. We find that we need a line of women's welts and we believe also that the men's shoe factories are making this class of merchandise better than the women's factories.

"Now if you are in a position financially to back us up we will take your line and push it for all we are worth. We would not like to consider it unless we thought we could build one hundred fifty thousand dollar business a year in a very short while. We have an expense account of eighteen thousand dollars a year in our business and we like to have advances made us by the factories that we represent for many reasons. The most important one is that our orders will get prompter attention and we have some chance of getting paid our commissions back. We do not believe it is a natural state of affairs for the salesman to spend his good money and wait until the shoes are shipped to get his commission.

"We are quite willing to enter into an agreement with you if you are willing to give us the right kind of a contract and drawing account and we will settle with each other every six months.

"You can get a special report on us through R. G. Dun & Company and you will find that we are amply able to take care of our obligations. We have always taken care of them and always expect to do so. This relieves you of hiring

·a salesman who falls down and you lose the money you have advanced to him and puts it upon us.

"We have a live set of men connected with us and two of them pay special attention to the selling of men's shoes.

"It would be impossible for the writer to come to Cincinnati any time soon as we are very busy just now and I am going to take a little recreation in the way of an automobile trip and will be away five or six weeks.

"You can look this matter over and let us hear from you as early as possible. We would like to know by the latter part of next week, as we are in touch with another line similar to yours."

To this the Manss-Owens Company replied May 27 thus:

"We beg to acknowledge receipt of yours of the 24th and in reply wish to say, in addition to our regular line of men's shoes, we are making an extremely strong line of high grade women's welts covering all popular lasts, patterns and materials which will be offered during the coming season. We expect to have the strongest line going out of this city and we are willing to enter into some arrangement with you to represent us in North Carolina, Virginia and Maryland.

"This offer is based on your statement that you can give us at least $100,000.00 worth of business. We are willing to allow you a reasonable drawing account and will be very glad to increase same as your sales justify.

"The entire proposition, however, will be on straight commission basis, with settlement at stipulated periods. The details of this arrangement can be completed at your convenience. We would like to know just what you want in the way of samples.

"According to our present plan, we expect to make about seventy-five samples of men's high shoes and oxfords which can be retailed at $8.00 and $9.00. We expect to make about twenty samples simply to show the various leathers and materials of men's shoes to be retailed at $6.00 and $7.00.

"In women's shoes we expect to have about ninety samples, ranging in price from $4.00 to $7.00. This price of course is wholesale as there is no way of *gag*ing the retail price of women's shoes.

"As soon as we hear from you we will outline a contract and submit same for your approval."

Then follow the two letters which construed together contain the details of the contract as finally agreed to, if there be such a contract. One is this letter of May 31, 1918, from the plaintiffs:

"In reply to your letter of the 27th instant will state that the writer has been out of the city all this week or your letter would have had earlier attention.

"My son and I have talked the matter over regarding your line and we believe we can sell one hundred fifty thousand dollars worth of shoes for you a year. We may be mistaken but we feel that way just now. The way you talk about the line of women's shoes you are going to make encourages us more in this belief, as my son and I would personally give six weeks each season to the sale of your women's shoes exclusively, if they are right in every detail and if you are willing to give us the proper backing we will make you this proposition:

"Deliver us as early in August as possible two full and complete sets of samples of both men's and women's shoes of all grades and styles that you make and sufficient trunks to carry them. Give us a guarantee of one hundred dollars per week for one year, starting August 1st, and settle with us at the end of twelve months on a six per cent commission basis for all shoes shipped into our territory: Virginia, North Carolina and a small portion of Maryland which leads from Cape Charles, Va., to Wilmington, Del.

"If this contract is perfectly satisfactory to you you may draw up the contract for each of us to sign.

"We have two or three accounts which we think will buy some of your shoes for fall delivery and in case we make

this agreement you can send us twenty-five or thirty of your men's samples and twenty or thirty of your women's samples at once by express prepaid with order book, envelopes, etc., and all sales we make for fall delivery you can settle with us on six per cent commission basis August 1st and start new contract from August 1st.

"Be sure to make all samples of women's oxfords and boots in Lawrence's $20 Gray Calf."

The other, the reply thereto, of June 8, 1918, from The Manss-Owens Company reading thus:

"Complying with yours of the 31st ult., we are sending you, by express, one trunk containing both women's and men's samples, a key for which is enclosed herewith.

"As you know we already have arrangements for the present season and cannot permit you to generally canvass the State of North Carolina as we have representation there and cannot interfere until the balance of the season, which ends August 1st. If, however, there are any customers with whom you have close connections in this State, you may sell them for immediate delivery.

"We will ship you about the first of August two complete lines of samples both men's and women's, all grades, and will send contract for your signature.

"It is understood that Washington, D. C., is to be excluded as this city is already allotted.

"On the immediate business we will pay you a straight commission of 6% as soon as the orders are confirmed and accepted by us.

"You will note we have included in the samples style S 071 and style S 073 which are women's calf boots which we carry in stock, the price of which is $5.50. We are also including S 050 and S 054 in the men's shoes and #803 which is our regular miracle shoe in the best grade, gun metal.

"We have this miracle shoe in the kid blucher and kid bal. gun metal bal. and gun metal blu, price of which is $6.00 either out of stock or to be made up.

"We are also sending you under separate cover one of our recent catalogs which shows the various shoes carried in stock. We have changed the prices on some of these numbers which you will carefully note. Style No. 202 has been closed out and we have no oxfords whatever on hand.

"You will find in the trunk complete description sheets of each shoe with the price, etc., together with order book and envelopes. We believe that you should be able to do a nice business.

"As previously advised we will make a much stronger line of women's shoes and can make practically anything which your customers may suggest. If you find you require anything that is not represented in the samples please let us know and we will give you a basis price from which you can figure any shoe. We hope to be favored with some nice busness.

"Wishing you success, we are," etc.

The next, dated July 15, 1918, is from the Manss-Owens Company, and contains an inquiry in these words: "If you have finished with the samples which we submitted, kindly return same, as we wish to have them mated up and shipped to the purchaser at once. Your prompt attention to this matter will be appreciated." Then follows a letter from the plaintiffs to the Manss-Owen Company, of July 22, in these words:

"We are returning today by express the trunk of samples. The writer has been absent for the last four weeks and am now back at my post and we want to get your two sets of spring samples as early as possible.

"We are figuring with a department store here who are contemplating putting in shoes. If this goes through why we will possibly sell them your women's shoes on a large scale. Please get your samples to us just as early as possible and let us know at once when we may expect them. The writer has been selling women's shoes to large retail-

ers at a discount of 5-30. Please let us know if you can give this discount on nice clean orders. I mean on the women's end of it. Of course, men's shoes are sold, as a rule, a little differently, but we want your best discount, best terms and prices. We believe you are going to make good shoes and if you do we are going to sell them.

"Please let us hear from you as early as possible, and oblige."

And another of July 24 from the plaintiffs to The Manss-. Owens Company, reading thus:

"Please make note to have three or four of the trays in each sample trunk you send us made for gripping so that they can be used outside. Our men do a lot of plugging and we noticed the trunk we just returned to you had no trays of this kind. Please be sure this is attended to and that our samples are sent to us, and oblige."

This is followed on August 5, 1918, by two telegrams, one from the plaintiffs to The Manss-Owens Company, reading: "Wire us at once when we can expect samples." To which the Manss-Owens Company replied on the same date: "Expect to have samples ready about September 1st." Then follows this letter, on August 9, from the plaintiffs to The Manss-Owens Company:

"We are in the habit of sending all of our telegrams paid. We wired you on Monday a paid message and received no reply. Yesterday we wired you again collect and received your reply collect. While this is a matter of only fifty-five cents it looks very small to us for a house of your calibre. We note what you say in your telegram that samples will be ready about September 1st. We shall expect our two sets of samples as early as possible. One of our men who expects to carry your line in the smaller towns is waiting for them before he can go out.

"Please refer to our letter of May 31st and your reply to same of June 8th and you will see that our agreement

starts from August 1st and that you are to send us one hundred dollars a week guarantee for twelve months. Please let us have your check to cover the August 1st remittance; also the August 8th remittance, making total of two hundred dollars. Please let this come to us by return mail.

"Please let our letter of July 24th relative to arranging the trays in sample trunks have your attention also.

"Please see that the checks are sent to us by return mail, and oblige," etc.

And another of the same date reading thus:

"Please send us your check additional for commissions up to August 1st as follows: Goodman Shoe Shop, $1,231.20, Economy Shoe Store, $607.20, total $1,838.40, commissions $110.20. Please let us have this check by return mail also, which is in accordance with your letter of June 8th."

Then one of August 10th, from The Manss-Owens Company to the plaintiffs, reading thus:

"We have yours of the 9th which is certainly a surprise to us as you seem to refer principally to checks which we are to send you.

"As far as the agreement is concerned we have not prepared same yet and certainly would not expect to furnish you money before the men are traveling.

"As we explained to you before, we sell the shoes only on a commission basis. It is customary to advance the men at the end of the month, money equivalent to the approximate amount earned, so we cannot understand why in the world you are asking for money before the men have started on the road.

"This certainly does not look good to us and has had only an effect to weaken our confidence in your selling proposition.

"We are enclosing herewith check to cover the amount due on the two sales which you have made and which we trust will be satisfactory."

The correspondence closes with the following letter of August 15th, to The Manss-Owens Company from the plaintiffs:

"In reply to your letter of August 10th in which you inclose check for $103.02 commissions on our sales up to August 1st, which was in compliance with your letter of June 8th. You state in this communication that you do not intend to live up to your agreement of June 8th. This letter of June 8th is attached to my letter of May 31st and unless you mail us a check by Saturday for three hundred dollars ($300.00) we shall turn this account over to our attorney with instructions to not only sue but attach everything we can get our hands on which belongs to the Manss-Owens Company. We do not propose to be treated in such manner.

"We have had two or three lines of women's shoes in your grades offered to us while we were east this summer. We turned them down because we had an agreement with you, which my letter of May 31st and your reply of June 8th surely indicates. We are ready to perform our part of it and shall expect you to do likewise, and if you fail to do so we shall drag you into the highest courts in this country. We have no more to say on this subject. You can take any road you see fit. We shall not write you another line regarding this contract.

"We have men whom we hire and pay good salaries to and the loss to us will be much greater from not getting your line of samples for this territory; but you can rest assured of this one thing that we are going to have one hundred dollars per week for fifty-two weeks from you. That is, if the Manss-Owens Company is financially responsible."

The question is, whether this correspondence contains all of the essential elements of a valid contract. It is claimed that there was no final assent or agreement to the terms proposed—no meeting of minds, which was necessary in order to complete the contract.

[1, 2] We first note that the mere fact that a written contract was contemplated does not necessarily show that no binding agreement had been entered into.

On this subject, Harrison, J., in *Boisseau* v. *Fuller*, 96 Va. 46, 30 S. E. 457, makes this clear and comprehensive statement of the generally accepted rule: "The whole question is one of intention. If the parties are fully agreed, there is a binding contract, notwithstanding the fact that a formal contract is to be prepared and signed; but the parties must be fully agreed and must intend the agreement to be binding. If though fully agreed on the terms of their contract, they do not intend to be bound until a formal contract is prepared, there is no contract, and the circumstances that the parties do intend a formal contract to be drawn up is strong evidence to show that they did not intend the previous negotiations to amount to an agreement." Citing Clark on Contracts, p. 38.

If it appears from the evidence that the minds of the parties have met; that on the one side there was a proposition for a contract, which proposition has been accepted by the other party; that the terms were in all respects agreed upon; and that a part of the mutual understanding was that a written contract embodying those terms should thereafter be executed by the respective parties, there results an obligatory contract which neither party is at liberty to repudiate. *Pratt v. Hudson River R. Co.*, 21 N. Y. 309.

The legal effect of telegrams under such circumstances is referred to in a note to *Cobb* v. *Glenn Boom & Lumber Co.*, 57 W. Va. 49, 49 S. E. 1005, 110 Am. St. Rep. 755, and it is said that if the correspondence and telegrams between the parties contain all the details of the contract, it is enforceable, even though the telegrams show that the agreement should be formally expressed in a single writing, which when signed should be evidence of what had already been agreed upon.

The subject is also treated in a comprehensive note, collecting many authorities, to the case of *Sanders* v. *Pottlitzer Bros. Fruit Co.*, 144 N. Y. 209, 29 N. E. 75, 29 L. R. A. 431.

If then the letters and telegrams, fairly construed, correctly express all of the terms to which the parties agree, then this constitutes a binding contract, even though there be an understanding that the agreement shall thereafter be expressed in a formal writing. Of course this is not true if the parties expressly stipulate that the contract is not to be binding until executed in a more formal manner, or if all of the terms of the contract are not substantially agreed to. 6 R. C. L. 618.

This brings us to a consideration of the evidence here involved. The plaintiffs had been fully established in business for many years. Their first letter to the manufacturer clearly indicates that their sole motive for opening the correspondence was to secure such a contract as that under which they now claim, and the entire correspondence must be reviewed in the light of this main general purpose.

[3] In this connection it is pertinent to quote this from 6 R. C. L. p. 644: "Where the relief sought is specific execution, it is essential that the contract itself should be specific. In other words, the certainty required must extend to all the particulars essential to the enforcement of the contract. But where there has been an entire breach, and compensation is asked in damages, it may be sufficient if there be certainty only as to the general scope and stipulations of the contract. It may well be doubted, however, whether there has been any practical recognition of any such distinction by the courts. However, the law does not favor, but leans against, the destruction of contracts because of uncertainty."

[4] It clearly appears in this case that the general purpose of the parties was by both thoroughly understood and

agreed to, and if there be any uncertainty as to the meaning of one provision of the alleged contract (that is, as to the advancement of $100 per week), that uncertainty is not as to the language by which the parties expressed their agreement, but grows out of their difference of opinion as to the true meaning of that provision. This, however, is of little consequence in the present case, because no construction of the provision is here required. Contracts are not invalid merely because the parties differ as to the construction of particular language employed by them in expressing their contract. Where there is a difference of opinion as to its meaning, the parties may seek the aid of a court to construe it, but such a difference, so far as we are advised, has never been held to invalidate a contract, unless the provision is of primary importance affecting the substance of the contract, and is so vague and indefinite as to make it impossible to determine its meaning, or the substantial rights of the parties thereunder.

In response to the primary proposition from the plaintiffs, the Manss-Owens Company indicated, to use its own language, that it would be "very glad to enter into the arrangements you suggested," and then expressed a desire for a personal interview "as soon as possible, so that we may get a line on about what you will need in the territory mentioned." In reply to this letter the plaintiffs went into details as to the situation, and among other things emphasized their requirement that the manufacturer must be in a position to make advancements, as a condition upon which they would enter into the agreement, saying affirmatively that they would like to make the contract if the manufacturers were in a position to aid them financially by making advancements, in accordance with the custom, and that they were willing to enter into an agreement if the manufacturers would give them "the right kind of contract and drawing account and we will settle with each other

every six months," thus negatively indicating that they would not enter into such a contract unless there was the promise to make such advancements. To this the manufacturers replied that they were willing to enter into such arrangement with the plaintiffs to represent them in North Carolina, Virginia and Maryland, and that they were willing to allow a reasonable drawing account, which they would be willing to increase as sales justified, but emphasized the fact that the entire proposition should be on a straight commission basis, with settlements at stipulated periods, and that the details of the arrangement could be completed at the convenience of the plaintiffs, and concluding that as soon as they heard from the plaintiffs they would outline a contract and submit it for approval. In the letter of May 31, from the plaintiffs to the Manss-Owens Company, which immediately followed, they made a definite proposition, with every essential detail succinctly stated, in these words: "Deliver us as early in August as possible two full and complete sets of samples of both men's and women's shoes, of all grades and styles that you make, and sufficient trunks to carry them. Give us a guarantee of one hundred dollars per week for one year, starting August 1st, and settle with us at the end of twelve months on a six per cent commission basis for all shoes shipped into our territory: Virginia, North Carolina and a small portion of Maryland which leads from Cape Charles, Va., to Wilmington, Del. If this contract is perfectly satisfactory to you, you may draw up the contract for each of us to sign." The response to this definite proposition is contained in the letter from the Manss-Owens Company to the plaintiffs on June 8, 1918. We do not deem it necessary again to repeat all of the terms of that letter here. The question is whether the language used therein was intended to be construed as an acceptance of the proposition. Just here it is helpful to distinguish between the two contracts indicated in this cor-

respondence. The plaintiffs offered to sell some of their shoes immediately for fall delivery and had stated in their previous letter that "in case we make this agreement," they could send some samples of men's and women's shoes, and that on sales made in consequence thereof for prompt delivery they were to receive six per cent commissions, and "start the new contract from August 1st." The language of that letter, "in case we make this agreement," is significant in construing the reply thereto, the letter of June 8th. The manufacturer responded to that letter by sending them a trunk of samples of both men's and women's shoes, but cautioned them that as they had already made arrangements for the present season, they could not permit them to generally canvass the State of North Carolina, until after August 1st, but permitted them to sell any customers in that State, with whom the plaintiffs had close connections, for immediate delivery—that is, in advance of the period of the main contract which related to deliveries to be made in the following year, 1919; and then follows the clause which responds to the definite proposition for this main contract which had been made by the plaintiffs in the previous letter, in this language: "We will ship you about the first of August two complete lines of samples both men's and women's, all grades, and will send contract for your signature. It is understood that Washington, D. C., is to be excluded, as this city is already allotted." They then promise to pay a straight commission of 6 per cent on immediate business, clearly referring to the subordinate contract, as soon as the orders are confirmed and accepted. Now the natural inquiry is, What contract was to be sent for signature? We think the irresistible conclusion is that this refers and can only refer to the contract indicated in the entire correspondence—that is to say, a contract of which the period had been named, one year, the territory had been designated, Virginia, North Carolina, and a small portion

of Maryland; the rate of commission had been fixed at 6 per cent, and the amount of the advancement had been named by the plaintiffs as a condition upon which they would enter into such a contract. That the plaintiffs considered all of the terms of this contract settled is apparent, because they severed their connection with another manufacturer, the Victor Shoe Company, of Lynn, Mass., with whom they had a similar contract previously on a guarantee of $150 per week. They made all their plans to sell the shoes of the Manss-Owens Company in accordance with this understanding. That these manufacturers also entertained the same view of their contractual relations for the ensuing year's business is indicated by their telegram of August 5th, when in response to the demand for samples they replied, stating that these samples would be ready about September 1st.

The difference between the parties arose as to the $100 per week claimed as a guarantee or advancement on their commissions by the plaintiffs. The Manss-Owens Company did not deny its obligation to give financial backing, or in accordance with the custom of the business to make advancements on account of commissions to be earned, but claimed that such advancements were only to be made while the salesmen were in the field and making sales. As to this the meaning of the contract may not be entirely clear, but if the Manss-Owens Company desired to modify or to clarify this item of the definite proposition which had been made, it should have done so clearly and distinctly, for good faith required this. Their failure so to do misled the plaintiffs into believing that their entire proposition had been accepted. There is, however, no reservation of any sort whatever as to such advancements in the letter of June 8th, which must therefore be construed as an acceptance by the manufacturer of the proposition as expressed by the plaintiffs. It may be that the custom of the business, if proved, might aid the court to construe that provision of the con-

tract if it had ever became a vital question. As it is not involved in this litigation, it is unnecessary for us to express any opinion as to its meaning. If the plaintiffs misconstrued that provision, this did not justify the manufacturer in repudiating the entire contract and thus defeating its main purpose and true intent.

[5] We conclude, therefore, that the agreement to enter into the contract is sufficiently clear as to all of its substantial terms to justify the plaintiffs' claim for damages arising out of its breach by the Manss-Owens Company.

The other question raised by the record is whether or not the evidence is sufficient to sustain the verdict.

[6] Much has been written in this connection since the rule stated in 1854 in *Hadley* v. *Baxendale,* 9 Exch. 341, 23 L. J. Exch. 179, 18 Jur. 358, 5 Eng. Rul. Cas. 502. That rule is, that the damages recoverable for breach of contract are such as may fairly and reasonably be considered as arising naturally—that is, according to the usual course of things—from the breach of the contract itself, or such as may reasonably be supposed to have been contemplated by both parties at the time they made the contract, as the probable result of the breach of it; and the rule is generally accepted as an accurate statement of the law, though some of its verbiage has been criticised. In 8 R. C. L., p. 457, it is said, that although the rule "is sometimes spoken of as having originated in that case, it is in reality an embodiment of civil law principles, and is substantially a paraphrasing of the rule on the subject as it had been stated at an earlier date in the Code Napoleon, by Pothier, and by Chancellor Kent."

[7] That the damages here claimed from the loss of the right to represent the manufacturer in the territory referred to are the natural and direct result of the breach of the contract, can hardly be doubted. While it is true that speculative and conjectural profits cannot be recov-

26

ered, it is well settled that damages which can be proved with reasonable certainty, which are the direct result of the breach, are not speculative and conjectural and may be recovered.

There are many instances in which recoveries of damages by salesmen under similar contracts which have been broken have been sustained.

In *re Patent Floor Cloth Co.*, 26 Law Times Rep. (N. S.) 467, 41 L. J. Ch. (N. S.) 476, a recovery was authorized for commissions which a traveling salesman would probably have earned if the contracting company with which he had a three year term had not determined to cease business before the expiration of that term.

In *Wakeman* v. *Wheeler & Wilson Mfg. Co.*, 101 N. Y. 209, 4 N. E. 264, 54 Am. Rep. 676, such a recovery is sustained in favor of a salesman of sewing machines, against a manufacturer.

[8, 9] The cases are not all in harmony, and it is frequently difficult in this class of cases to determine when opinion evidence may be received to prove the amount of damages, but one who violates his contract with another should generally be held responsible for all direct and proximate damages which result from such violation. Such damages must be not merely speculative or imaginary, they must be reasonably certain, and they must be consequent upon a breach of the contract. If they are so remote as not to be directly traceable to that breach, or are attributable to some other intervening cause, then they cannot be allowed. Such damages, however, are nearly always involved in some uncertainty and contingency, and can be determined only approximately upon reasonable conjectures and probable estimates. If they are so uncertain, contingent and imaginary as to be incapable of adequate proof, then they cannot be recovered. When, however, it is certain that substantial damage has been caused by the breach

of a contract, and the uncertainty is not whether there have been damages, but only an uncertainty as to their true amount, then there can rarely be any good reason for refusing all damages due to the breach merely because of that uncertainty.  The violator of his contract should not be allowed to escape all liability simply because the precise amount of the damages for which he is responsible is uncertain.  Nearly all commercial contracts are entered into in contemplation of future profits.  As such profits are prospective, they must be uncertain and problematical, but the person injured is not to be deprived of all remedy.  He has the right to prove the nature of his contract, the circumstances surrounding and following its breach, and the consequences naturally and directly traceable thereto; and it is for the jury, under proper instructions, to determine the compensation to be awarded for the breach.  That compensation should be the value of the contract.

Another instructive case is *Pittsburg Gauge Co.* v. *Ashton Valve Co.*, 184 Pa. 36, 39 Atl. 223, where it is held that where a salesman is given a contract to handle the manufacturer's goods within a certain territory for three years, and to receive a commission of ten per centum on all goods sold in that territory, and the principal, before the expiration of the specified period breaks the contract, the agent may show, as tending to prove the damages, the extent and volume of the business under his own agency and the extent and volume of it under the agent appointed in his place; and was allowed to recover.

In *Rice* v. *Caudle*, 71 Ga. 605, a recovery was authorized growing out of the breach of a contract for the exclusive right to sell goods in a certain territory, which was broken by the vendor.

In *Schumaker* v. *Heinemann*, 99 Wis. 255, 74 N. W. 785, a traveling salesman was allowed to recover damages based upon the percentage of goods that he might have sold had

he been allowed to continue in the defendant's employment, and the court said: "True, the determination of what sum of money will cover damages of that nature is always attended with considerable uncertainty, and, as this court has frequently observed, the adoption of that as a measure of recovery in any case is liable to operate injuriously and unjustly. At the same time it may be said that to refuse to apply the rule in every case would lead to frequent violations of that natural justice upon which the recovery of damages for wrongs is supposed to be grounded. So it is well established that loss of profits, where there are some substantial data to determine them from, is a proper measure of damages. If it were not so, manifestly, many cases would arise where breaches of contract obligations would be without any remedy at all, by compensation in damages."

To like effect is *Cranmer* v. *Kohn*, 7 S. Dak. 247, 64 N. W. 125, and *Federal Iron & Brass Bed Co.* v. *Hock*, 42 Wash 669, 85 Pac. 418.

The authorities may be found collected in a comprehensive note to *Wells* v. *National Life Association*, 39 C. C. A. 476, 99 Fed. 222, 53 L. R. A. 77, and sustain the view which we here take. *Howard* v. *Stillwell, etc. Mfg. Co.*, 139 U. S. 199, 11 Sup. Ct. 500, 35 L. Ed. 150.

In the very recent case of *Macon* v. *Scandinavia Belting Co.*, 264 Pa. 384, 107 Atl. 750, 5 A. L. R. 1505, in which there was a contract whereby the plaintiff was given the exclusive right to sell belting for the Scandinavia Belting Company, a recovery was sustained, and this is said: "The measure of damages in a case of this class is the value of the contract at the time of its breach, and if it reasonably appears that profits would be realized if the contract were carried out, and that the loss of such benefits necessarily followed the breach, their amount may constitute the true measure of damages (*Wilson* v. *Wernwag*, 217 Pa. 82, 66

Atl. 242, 10 Ann. Cas. 649; *Press Pub. Co.* v. *Reading News Agency,* 44 Pa. Super. Ct. 428), and it has been held that where an agent agreed to sell his principal's goods within a certain district for a fixed period, and before the expiration of the time the principal declared the contract at an end without sufficient cause, the agent may show the extent and volume of business done in the territory under both his agency and that of his successor, as bearing upon the question of damages. * * * The verdict was conservative under the evidence, and while, in the nature of the case, the amount of profits was necessarily uncertain, the law does not require absolute certainty of data upon which they are to be estimated. All that is required is such reasonable certainty that damages may not be based wholly upon speculation and conjecture." Citing *Hillsdale Coal & Coke Co.* v. *Pennsylvania R. Co.,* 229 Pa. 61, 78 Atl. 28, 140 Am. St. Rep. 700.

[10] Under our view of the case, the plaintiffs were clearly entitled to recover the value of their contract. The only practical way to determine this value was to introduce evidence as to the probable amount of sales which they would have made if they had been allowed to perform their contract, and the best way to make an intelligent estimate of this value was to consider the extent of the territory and the past experience of the plaintiffs in selling goods of a similar character in that territory. From the evidence introduced, the jury might well have concluded that if the plaintiffs had been allowed to perform their contract, they could have sold for the Manss-Owens Company at least $50,-000 worth of shoes for delivery in the spring of 1919. If they had done so, the plaintiff's remuneration would have been six per cent thereon, or $3,000. The jury allowed the sum of $2,600, and we find no sufficient reason for disturbing the judgment of the trial court based on that verdict.

*Affirmed.*