**FARM AND GARDEN SALES,**
Incorporated

v.

**ALLIED EQUIPMENT COMPANY,**
Incorporated.

**ALLIED EQUIPMENT COMPANY,**
Incorporated

v.

**FARM AND GARDEN SALES, Incorporated, and Weber Engineered Products, Incorporated.**
Civ. A. No. 2008.

United States District Court
E. D. Virginia, Richmond Division.
Feb. 20, 1956.

William H. King, Richmond, Va., for plaintiff.

Robert R. Gwathmey, III, Richmond, Va., and George E. Allen, Richmond, Va., for defendant.

HUTCHESON, Chief Judge.

Farm and Garden Sales, Incorporated, hereinafter referred to as the plaintiff, as an instrumentality of Weber Engineered Products, Incorporated, hereinafter referred to as the plaintiff also, brought this action against Allied Equipment Company, Incorporated, hereinafter referred to as the defendant, to recover a balance of $7,899.86 due on account receivable. The defendant asserted the following affirmative defenses:

1. Set off of $8,069.46

2. Counter-claim for damages due to cancellation of the distributorship (breach of contract) and asserted that the damages should be trebled under Section 3 and Section 4 of the Clayton Anti-trust Statute, 15 U.S.C.A. §§ 14, 15.

The case was tried before a jury which returned a verdict for the plaintiff in the amount of its claim and a verdict for the defendant on a portion of the set-off and on its counter-claim awarded the sum of $15,000. In response to interrogatories the jury determined in effect, that the acts of the plaintiff constituted a violation of the Clayton Act. The plaintiff thereupon filed this motion to set aside that portion of the verdict based upon the counter-claim.

The issue raised by this motion goes to the efficacy of the counter-claim. May the counter-claim be sustained on the facts and the applicable law?

In July of 1949 the defendant became a distributor of the Choremaster Line, Farm and Garden Equipment, for Lodge and Shipley, the manufacturer. On December 1, 1952, a letter was sent to defendant by plaintiff informing defendant that plaintiff had purchased the Choremaster Division of Lodge and Shipley and would be the manufacturer; that plaintiff desired defendant to continue as a distributor and would continue operating as they had in the past with almost the identical personnel. Mr. Louis L. Weber, formerly a vice-president of Lodge and Shipley, would be president of both the plaintiff corporations. Thereafter the defendant continued as distributor for plaintiff in Virginia until September 24, 1953, the date of cancellation.

There has never been executed any written contract to cover the distributorship arrangement between the parties but the relation of the parties has developed according to the custom of the business as time went by. Although the plaintiff did furnish price lists, apparently there was never any quota imposed on defendant. The only understanding as to duration or termination seems to have been "as long as defendant did a good job". During the 1952 year the defendant was the largest distributor of

equipment produced by plaintiff (excluding Sears Roebuck). Mr. D. B. Usry, president of defendant, was appointed to a three-man advisory committee formed by plaintiff in connection with problems of distribution. As time passed defendant was extended a line of credit by plaintiff up to $40,000. In the first year of the association defendant was not extended any credit and orders were received on a sight draft basis. As the distributorship flourished defendant gave valued suggestions to plaintiff. In 1953 defendant's sales fell off and defendant lost its standing as top distributor.

In January 1953 defendant, desirous of expanding, made plans to have a new building constructed. The builder needed assurance that defendant would continue in the business and defendant requested such assurance from plaintiff. In response to that request the plaintiff wrote the defendant, under date of January 22, 1953, as follows:

"This is the fifth anniversary of your association with Choremaster as our Virginia distributor, and I would like to take this opportunity to thank you for the splendid job you have done with our line.

"I know that your thinking and ours coincides in that we are all interested in building Choremaster year after year. That is exactly what you have done, and I wanted to take this opportunity to express my appreciation for your splendid cooperation. With the rapid expansion of the Choremaster line, i. e., tillers, mowers, we feel that our volume, and that of our distributors, should grow from year to year in the future.

"I hope that we may have the pleasure of many more years of pleasant, profitable association. Please convey my best regards to all the members of your organization."

Following receipt of that letter, defendant entered into a fifteen-year lease with the builder at a rental of $500 per month. In September of 1953, defendant gave consideration to becoming distributor for a cultivator known as the "Champ Tiller", manufactured by Quick Manufacturing Company, a competitor of plaintiff, in addition to the equipment manufactured by plaintiff. After being advised of this, Mr. Weber notified defendant that he was coming to Richmond for a conference. This conference was had on September 11, 1953, and defendant was informed that if it took on the competitive line, the existing distributorship would be terminated. By letter of September 15 to plaintiff the important parts of this conference were outlined by defendant in nine points and plaintiff was requested to answer these nine points in letter form.[1] Plaintiff on Sep-

---

1. "Notwithstanding the fact that I was deeply shocked when I learned of the purpose of your visit to my office last Friday, I am deeply grateful to you for your visit. I hope while you were here you realized even more some of our problems and got an insight into our plans of doing a better job for you and other factories in the future.

"Mr. Weber, the subject which we discussed is a serious one because it affects, for better or for worse, our future. My answer is not an easy one to arrive at. You have been very good to give me a few days to think this thing through before giving you my answer.

"As you know, we talked straight to each other for a period of perhaps seven or eight hours and a lot of things were cussed and discussed. However, in considering this situation, it would help me a lot to outline herein the way I understood some of the more important points and especially to request you to reply to these in a letter by return mail covering each point I bring out as well as those I know I may have overlooked. I want to keep this clear in my mind and to know just what I have to decide and this is the best way for me to consider it. Please tell me in each case if my understanding is correct:

"(1) If we elect to distribute a small power unit which could be called a tiller, garden tractor, etc. which Jim Quick is now developing and recently informed us he would ship a sample to us, you will cancel our distributorship on (a)

tember 18, 1953, called defendant by telephone and answered the nine-point letter.[2] As a result of this conference and

the ensuing communications defendant was informed by plaintiff that if it handled the competitive line of equipment

Choremaster garden tractors, (b) Choremaster tillers, and (c) Choremaster power hole diggers.

"(2) If we elect to distribute any other equipment such as Quick is developing, such as Ariens, Roto-Hoe, etc., you will also cancel our distributorship, whether or not we handle Quick's new unit. At this point, in your reply, please give us a list, or a better description, of those items we should· not handle of this nature.

"(3) The reason you would do this is because this type of equipment is too closely in competition with the Choremaster rotary tiller. Of course, I feel that it is more closely in competition with our multi-purpose tractor.

"(4) If we handle another brand one-wheel garden tractor, will you also cancel our distributorship in its entirety?

"(5) While you seemed critical the last time I was in your office of our sales record, you now consider we have done a good job.

"(6) You respect, and will continue to respect, the rights of other factories where they gave us a line first. To illustrate, you would very much like for us to handle your chain saw but since Lombard was with us first, you would not and could not compel us to handle yours.

"(7) The only competition you will allow us to face on the tiller is Sears-Roebuck, accepting the fact that they will sell the tiller for less than our dealers, and there will be absolutely no other person here handling the one-wheel tractor either under the name 'Choremaster' or other.

"(8) You will allow us to return for credit, less 10% handling charges, all Choremaster stock of all nature.

"(9) Will you give us a written contract to represent you exclusively in the state of Virginia which clearly defines both our duties and yours, and for what duration?

"I still feel that you are wrong in insisting that we be forced to make the decision of refraining from handling lines of this nature when we may need such lines to complete our sales program—unless and until we fall down on the job we have to do for you. However, I am behind the eight ball because we have worked too hard and too long on Choremaster to treat the subject lightly. If we wanted to, it is going to be difficult the first year to replace this Choremaster volume, and I tried to make it perfect-

ly clear to you that we are compelled to greatly *increase* our sales.

"For obvious reasons, I hope you will keep this letter confidential. I have promised you a decision not later than October 5th. Therefore, won't you please reply immediately?"

2. "At approximately 11:02 a. m., on September 18, Mr. Louis Weber of Weber Engineered Products, Cincinnati, telephoned me with regard to my letter to him of September 15 setting forth certain questions on which I had requested a written reply. Mr. Weber made it clear to me that he was willing to give me the answer to each of the nine points outlined therein by telephone, but was not willing to cover such in a letter in its entirety. I appealed to him to answer the letter so as to provide us with a straight record for our immediate decision, as well as to provide a yardstick for future operation if our representation was not cancelled. Mr. Weber insisted on answering each question and in the conversation promised to write me a reply in the best form possible. Following is a list of questions submitted to him in our letter:

· " 'If we elect to distribute the small power unit which could be called a tiller, garden tractor and so forth, which Jim Quick is now developing and recently informed us that he would ship a sample to us, you will cancel our distributorship on (a) Choremaster garden tractor, (b) Choremaster tiller, and (c) Choremaster power hole digger?'

"Mr. Weber's answer was, 'Yes.'

" 'No. 2: If we elect to distribute any other equipment such as Quick is developing, such as Ariens, Roto-Hoe, et cetera, you will also cancel our distributorship, whether or not we handle Quick's new unit? At this point in your reply, please give us a list or a better description of those items we should not handle of this nature,' and I told Mr. Weber I was making notes, to go slower.

" 'Answer: Ariens, Roto-Hoe, or any other competitive equipment,' and this is my notation, it is not what Mr. Weber said: 'I insisted that he further elaborate on this statement and reply in writing and told him I just had received this morning a Foley tiller for inspection.'

" 'No. 3: The reason I am asking you do this is because this type of equipment is too closely in competition with the Choremaster rotary tiller. Of course,

the existing distributorship would be terminated. Defendant was also offered a two-year contract by plaintiff if it would forego handling the competitive product. By telegram defendant on September 24, 1953, notified plaintiff it had decided not to accept the terms and thus its distributorship was cancelled. Defendant contends that as a result of this cancellation its business and reputation were damaged in the trade through the state. Defendant also lost many dealers, whose business was later solicited by a factory representative of plaintiff to become dealers on behalf of plaintiff.

Plaintiff by its motion makes three contentions, namely:

1. There is no enforceable contract because of the lack of mutuality;

2. There is no basis in facts for the application of the Clayton Anti-Trust Act, Sections 3 and 4;

3. There is no basis for the damages and consequently they are excessive.

Plaintiff cites a persuasive line of cases to support his first contention: Curtiss Candy Co. v. Silberman, 6 Cir., 45 F.2d 451; Jordan v. Buick Motor Co., 7 Cir., 75 F.2d 447; Willard, Sutherland & Co. v. United States, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086; William C. Atwater & Co. v. United States, 262 U.S. 495, 43 S.Ct. 595, 67 L.Ed. 1089; Fitzgerald v. First National Bank of Rapid City, 8 Cir., 114 F. 474; Cold Blast Transportation Co. v. Kansas City Bolt & Nut, 8 Cir., 114 F. 77; and others. These particular cases cited all deal with manufacturer and dealership agreements. Some of these are written and others are oral. In most instances both parties were experienced in that specific type of business. These cases all hold such contracts unenforceable and in each case used similar language. The language in Curtiss Candy Co. v. Silberman, supra, is typical.

"Matters of quantity, type of merchandise, price, and other terms being left undetermined, the negotiations of the parties can at best be considered as resulting in a series of separate and independent sales, each complete in itself, and each consisting of its individual order, accepted and the sale completed on the part of defendant by delivery of the merchandise. There was undoubtedly a mutual expectation of an in-

---

I feel that it is more closely in competition with our multi-purpose tractor.

" 'Absolutely, yes.

" 'No. 4: If we handle another brand of one-wheel garden tractor, will you also cancel our distributorship in its entirety?

" 'Yes.

" 'No. 5: While you seemed critical the last time I was in your office (I was out there in July) of our sales record, you now consider we have done a good job?

" 'Yes, except tiller. We do not feel like you have done as well as you could have done on this.

" 'No. 6: You respect and will continue to respect the rights of other factories where they gave us a line first? To illustrate, you would very much like for us to handle your chain saw, but since Lombard was with us first, you would not and could not compel us to handle yours.

" 'Yes. One year from now we expect to have a two-wheel tractor, but if you insist on handling Quick's, we can't compel you to handle ours.

" 'No. 7: The only competition you will allow us to face on the tiller is Sears-Roebuck, accepting the fact that they will sell the tiller for less than our dealers, and there will be absolutely no person here handling one-wheel tractor either under the name Choremaster or other?

" 'No one else on tiller except Sears-Roebuck. Absolutely no other distribution on the Choremaster garden tractor in its present form.

" 'No 8: You will allow us to return for credit, less 10% handling charges, all Choremaster stock of all nature?

" 'Only new stock in original cartons.

" 'No. 9: Will you give us a written contract to represent you in the state of Virginia which clearly defines both our duties and yours, and for what duration?

" 'Present territory, yes. Will consider two-year period. I am willing to talk about balance of state in the future."

definite continuance of this relationship, but the contract lacked that mutuality necessary to make it enforceable in so far as executory obligation was concerned." Id., 45 F. 2d at page 452.

The majority of these cases also rely on and cite Section 32 of the Restatement of Contracts, i. e.:

"An offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain." Id. at 40.

However, one does not have to go outside the Fourth Circuit since there are two cases in point decided by the Court of Appeals. In Ford Motor Co. v. Kirkmyer Motor Co., 65 F.2d 1001, 1003, the plaintiff was orally promised a West End Ford dealership in Richmond, Virginia, if such a dealership should be created and if the plaintiff would open a dealership in South Richmond. Plaintiff opened a dealership in South Richmond and subsequently defendant awarded the West End Ford dealership to a third party. Plaintiff then brought action on the oral contract. In an opinion by Judge Parker, the Court in reversing a verdict in favor of plaintiff, said:

"But we base our decision, not on this ground, but on the ground that the verbal contract upon which plaintiff relies, in so far as it relates to the sale of defendant's products to plaintiff, is lacking in mutuality and is entirely too indefinite to form the basis of a binding obligation on the part of the defendant. This contract was not one of sale, or of hiring, or of agency. Viewed in the light most favorable to plaintiff, it was nothing more than a conditional contract to sell goods to plaintiff in the future upon the terms and prices at which sales were made to other dealers, but without specifying the amount of goods to be sold or purchased. To say that the parties contemplated that plaintiff should be given a contract of the character that defendant was making with other dealers in 1930, such as it entered into with plaintiff in South Richmond or with the Womble Motor Company for the West End, does not help plaintiff's position; for this written contract does not obligate defendant to deliver a single car or truck and may be terminated at any time at the will of either party. It merely furnishes a basis upon which dealings are to be conducted; and, while it is a binding contract to the extent that it is performed, in that it attaches to and becomes a part of transactions entered into so long as it remains uncanceled (Willard, Sutherland & Co. v. United States, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086) and imposes certain obligations as to how dealings shall be conducted, it imposes no obligation on defendant to sell or on the dealer to buy and furnishes no basis for recovery of damages if defendant refuses to sell."

Judge Northcott in a dissent held that there was a separate and distinct oral promise and that plaintiff should be reimbursed to the extent that he expended money in reliance thereon. Two years later in 1935 the Court of Appeals for the Fourth Circuit (Judge Parker writing the opinion and Judge Northcott dissenting) in Motor Car Supply Co. v. General Household Utilities Co., 80 F. 2d 167, reached the same conclusion in a case involving the termination of a distributorship by a manufacturer. The Court relying on the Kirkmyer case sustained a ruling by the trial court allowing the plaintiff to demur to the defendant's special pleas of counter-claim and set-off. There the plaintiff manufacturer orally agreed to sell a specified number of refrigerators. The written contract allowed for thirty days' notice of termination. The plaintiff gave such notice and did not deliver the number of refrigerators. The Court held that the agreement as to numbers only amended the original contract to the specified number, but either party could still ter-

minate with or without cause on thirty days' notice. Thus, in fact, neither was bound to sell, or to buy. Therefore mutuality was lacking. On March 9, 1953, this Court sustained a motion for summary judgment on the "phase of the case involving cancellation of the dealer's contract", in the case of Emmett E. Haynes, indiv. and t/a etc. v. Ford Motor Co., Civil Action #1220, which case is unreported. In so doing I followed the precedent laid down by the Court of Appeals for the Fourth Circuit.

The defendant contends that this particular situation is different and consequently does not come under the mutuality rule and relies upon Meurer Steel Barrel Co. v. Martin, 3 Cir., 1 F.2d 687. There the plaintiff was granted a nonexclusive license to practice the invention patented by defendant. The license might be terminated at will upon notice. The trial court held the contract unenforceable because of lack of mutuality of obligation. The Court of Appeals for the Third Circuit reversed and remanded on the ground that the contract was otherwise valid and that the action was one at law for breach of contract. The Court said mutuality did not have to go to every phase of the contract in an action at law and thus distinguished between an action at law and one in equity to enforce specific performance. However, that case may be distinguished from the one at bar because here there is no written contract "otherwise valid". Here all the terms are determined by the custom of the trade and the practice of the parties.

In Hunt v. Stimson, 6 Cir., 23 F.2d 447, cited by defendant, the facts are different from those at bar. There the contract was for the output of the factory, not merely one of distributorship. The Court held that mutuality existed where the quantity was for the output, even though the quantity was uncertain.

The case of Nathan Elson v. Beselin & Son, 116 Neb. 729, 218 N.W. 753, allowed damages to the distributor against the manufacturer. Plaintiff manufacturer gave defendant an exclusive contract on condition that defendant would dismantle its own factory and refrain from further manufacturing. Defendant complied. The Court based its decision on "some consideration other than a promise for a promise". Therefore, lack of mutuality, i. e., the requirements of a contract did not defeat the right of the distributor. The Court held that the dismantling of its factory by the defendant was the other consideration.

A California case, J. C. Millett Co. v. Park & Tilford Distillers Corp., D.C., 123 F.Supp. 484, is almost on all fours with the case at bar. Plaintiff, the distributor, entered into an oral agreement with defendant, the manufacturer, to distribute in a given area. Both parties had long experience in this business and each knew what was required to do a satisfactory job. The custom of the trade was not to have any written contract and to have no fixed period of termination, but rather a cancellation at will upon notice. Plaintiff in the negotiations attempted to obtain a definite termination agreement but he failed. However, he was repeatedly assured that the defendant "never cut anyone off." There was no definite agreement as to quantity or quotas. However, defendant fixed the prices. Defendant cancelled the arrangement on short notice and plaintiff brought this action. The Court allowed damages and held that lack of mutuality did not bar because of the knowledge of both parties and the custom of the trade. The Court found as a fact that the notice given was unreasonable and that one year's notice would be reasonable. Thus the damages were based on the unreasonable notice, rather than the cancellation itself.

The Millett case, supra, and the Nathan Elson Co. case, supra, are both very persuasive for the defendant. But, although the results are the same, the Courts in each case used entirely different reasoning to obtain those results.

Counsel for the defendant urges that the Virginia case of Manss-Owens Co. v. H. S. Owens & Sons, 129 Va. 183, 105 S.E. 543, states the Virginia law. Counsel admits that this case does not ex-

**324**

pressly state the law of mutuality, but does assume mutuality in order to sustain the decision. But the 1954 case of Town of Vinton v. City of Roanoke, 195 Va. 881, 80 S.E.2d 608, definitely lays down the Virginia law on mutuality to the effect that a contract lacking mutuality is unenforceable.

In view of the large number of cases holding that lack of mutuality renders a contract unenforceable and relatively few that hold otherwise, I must construe them to represent the majority view and the Millett case, supra, etc., the minority view. Upon considering the principles laid down by the Fourth Circuit Court of Appeals, I have reached the conclusion that the motion should be granted. In this connection, see the concluding paragraph of Judge Parker's opinion in the Kirkmyer case, supra [65 F.2d 1006], where he discusses the harsh result:

"It appears that plaintiff has been disappointed in its expectations and has been dealt with none too generously by the defendant; but, while we sympathize with its plight, we cannot say from the evidence before us that there has been a breach of binding contract which would enable it to recover damages. While there is a natural impulse to be impatient with a form of contract which places the comparatively helpless dealer at the mercy of the manufacturer, we cannot make contracts for parties or protect them from the provisions of contracts which they have made for themselves. Dealers doubtless accept these one sided contracts because they think that the right to deal in the product of the manufacturer, even on his terms, is valuable to them; but, after they have made such contracts, relying upon the good faith of the manufacturer for the protection which the contracts do not give, they cannot, when they get into trouble, expect the courts to place in the contracts the protection which they themselves have failed to insert."

Once the first contention of the plaintiff is granted, the unenforceability of the contract renders it unnecessary to consider the other two contentions. There can be no damages and the Clayton Act, Section 4, merely trebles damages.