611 F.2d 969
 COASTLAND CORPORATION, Appellee,
v.
THIRD NATIONAL MORTGAGE COMPANY, as successor to defendant
John W. Murphree Company, Appellant,
and
Kenneth R. Larish and Grover C. Cauthen, Defendants.
COASTLAND CORPORATION, Appellant,
v.
THIRD NATIONAL MORTGAGE COMPANY, as successor to defendant,
John W. Murphree Company, Appellee.
 Nos. 78-1418, 78-1420.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 5, 1979.
Decided Dec. 26, 1979.
 
 Thomas P. Kanaday, Jr., Nashville, Tenn. (Robert D. Tuke, Farris, Warfield & Kanaday, Nashville, Tenn., Braden Vandeventer, Robert L. O'Donnell, Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for Third National Mortgage Co.
 Philip G. Denman, Norfolk, Va. (James C. Howell, Willcox, Savage, Lawrence, Dickson & Spindle, Norfolk, Va., on brief), for Coastland Corp.
 Before RUSSELL and WIDENER, Circuit Judges, and DUMBAULD, Senior District Judge.*
 WIDENER, Circuit Judge:
 
 
 1
 Third National Mortgage Company (Mortgage Company or appellant), defendant in the action below, appeals from the decision of the district court holding that it breached an oral commitment to provide construction financing to Coastland Corporation for the construction of a condominium project. The district court awarded Coastland $620,650.00 in damages for the breach. The Mortgage Company contends that the district court erred both in finding that an oral commitment existed and in its award of damages.[1] Coastland has filed a cross-appeal contending that the district court's limitation of damages was erroneous. Jurisdiction in this case is based upon diversity of citizenship, 28 U.S.C. § 1332, and both parties agree, as they did in the court below, that the disposition of the issues raised on appeal is controlled by the law of Virginia.
 
 
 2
 Coastland brought suit in the district court against Third National Bank in Nashville; John W. Murphree Company, now Third National Mortgage Company (appellant); Kenneth R. Larish, President of Third National Mortgage Company; and Grover C. Cauthen, former Vice President of John W. Murphree Company, alleging that Third National Mortgage Company breached an alleged agreement made through Cauthen to provide construction financing to Coastland for the proposed construction of a condominium project to be known as the Schooner Point Condominium in Currituck, North Carolina. The district court either dismissed as to, or found for, Third National Bank, Cauthen and Larish. Those actions are not questioned on appeal. As noted, however, it entered judgment against the Mortgage Company.
 
 
 3
 The evidence adduced at trial includes the following. Coastland, a North Carolina corporation with its principal place of business in Virginia, was formed in 1970 and is engaged in the business of real estate development. In 1971, Coastland purchased approximately 600 acres of land approximately seven miles north of Duck and twenty-four miles north of Nagshead on the Outer Banks of North Carolina, for purposes of residential development. A master plan of development was prepared for this tract of land under the name Ocean Sands Subdivision. The plan included provisions for the construction of a condominium project to be known as the Schooner Point Condominium. This condominium project was envisioned as consisting of 134 units, with seventy-one units being constructed during the first phase of development.
 
 
 4
 James E. Johnson, Jr., President of Coastland, and Gary G. Cowan, a former officer of Coastland, testified that in January 1974 Coastland began to seek financing for the first phase (71 units) of the Schooner Point project. Appellant was one of the institutions Coastland went to in search of financing. Johnson and Cowan testified that Coastland sought both construction and permanent financing for the project, and entered into discussions with Cauthen, who was acting on behalf of the Mortgage Company, for that purpose.
 
 
 5
 In connection with the seeking of financing for the condominium project, Coastland provided appellant with cost breakdowns, projected sales figures, estimated budgets, plans, legal documents and other information relating to the project. Johnson and Cowan testified that after the above documentation was supplied, appellant, acting through Cauthen, verbally agreed in May 1974 to provide Coastland with both construction and permanent financing for the first phase of the project.
 
 
 6
 The commitment to provide permanent financing to qualifying individual purchasers of the proposed condominiums was reduced to a written agreement dated June 26, 1974. It was for a total of $3,100,000.00, and was to expire on December 31, 1975. Coastland agreed to pay a fee of $100,000.00 for the commitment for permanent financing. At the time Coastland accepted the permanent financing commitment, it paid appellant $50,000.00 in cash therefor, and issued a note for $50,000.00 payable on or before November 1, 1974 for the unpaid balance of the commitment fee. There are no contentions between the parties concerning either the existence or terms of the permanent financing commitment.
 
 
 7
 The verbal commitment to provide construction financing was not reduced to writing. However, Johnson testified that subsequent to Cauthen's assurance in May 1974 that both construction and permanent financing would be available Cauthen called him by telephone to inform him that he, Cauthen, had worked out the details of the financing with Cowan. Cowan testified that the construction financing was to be in the amount of 2.2 million dollars at 41/2 percent over the prime interest rate, and that the financing would be available for up to eighteen months. Cowan also testified that Coastland was to pay appellant a fee of $20,000.00 to $40,000.00 for the construction financing commitment, but this fee was never paid.
 
 
 8
 Both Johnson and Cowan testified that the construction financing commitment was not reduced to writing because of a tight banking situation precipitated by the collapse of the Franklin National Bank. They testified that several weeks after Cauthen assured them of construction financing, and prior to the issuance of the written commitment for permanent financing, Cauthen called Coastland to inform it that appellant's parent company, Third National Bank, did not want it to make any commitments for approximately six months in order to improve its liquidity. Johnson and Cowan further testified that Cauthen related that because of this policy, funding for the construction financing commitment could not be immediately forthcoming, but that around January 1, 1975 funding for said commitment should be available. Cowan testified that Cauthen said Coastland would be "on the top of the list and could go ahead and get (its) funding" in January 1975.[2]
 
 
 9
 Subsequent to the just mentioned telephone conversation and the execution of the written commitment for permanent financing, in a letter dated July 5, 1974, from Cowan to Cauthen, Cowan stated, "As we discussed, the 12/31/75 commitment date (for permanent financing) may be a little tight, and you indicated you would grant a reasonable extension if the need arises." At trial, Cowan explained the reference to the permanent financing commitment date of December 31, 1975 as being too tight as follows:
 
 
 10
 "Well, we had negotiated originally the terms of the permanent loan at the same time of the construction loan, and, therefore, we had set that date as a reasonable date because we intended to start construction in the immediate future, but the fact the construction loan now had been deferred for a period of six months we wanted to extend the period of the termination date of the permanent financing."
 
 
 11
 Johnson also testified that Coastland sought an extension of the termination date for the permanent financing commitment because appellant could not provide the construction financing at the time originally anticipated.
 
 
 12
 Cauthen did agree to extend the termination date of the permanent financing commitment from December 31, 1975 to September 1, 1976. In October 1974, Cauthen went to Coastland's offices in Virginia Beach, where the extension of time for the permanent financing commitment was executed. At that time, $25,000.00 was paid on the promissory note that had been given for the balance of the fee for the permanent financing commitment. The time for payment of the remaining $25,000.00 balance was extended from November 1, 1974 to April 1, 1975, and a new promissory note was issued for the balance.[3] Johnson testified that this new arrangement for paying the balance of the fee for the permanent financing commitment was adopted "because the permanent loan was extended because the construction loan was going to be provided later."[4] Additionally, both Johnson and Cowan testified that at this October 1974 meeting Cauthen reassured them that he thought the construction financing would be available in January 1975, and certainly no later than April 1975.
 
 
 13
 Johnson further testified that in early 1975 he contacted Larish, whom he understood to be the new president of appellant, to exercise the commitment for the construction financing loan. Johnson testified that Larish informed him that he would check into the matter and get back in touch with him, but never did. Johnson said that he tried to contact Larish numerous times via telephone, letter, and his attorney, but never received any response to his inquiries. Larish admitted that he did not respond to these inquiries of Johnson or his attorney.
 
 
 14
 Larish began his employment with appellant in February 1975. He testified that the construction financing matter first came to his attention in March 1975 during discussions with Cauthen, as well as after receiving a memorandum from Cauthen that discussed the matter. Larish further testified that Cauthen stated to him that he never "verbally or formally" committed appellant to provide Coastland with construction financing but, rather, made a single commitment to provide Coastland with permanent financing.
 
 
 15
 A number of internal memoranda sent between various employees of the Mortgage Company were introduced by Coastland which support its contention that appellant entered into a binding commitment to provide Coastland with construction financing. Cauthen sent a memorandum dated October 22, 1974 to Richard G. Keeran, then President of John W. Murphree Company, that concerned the Schooner Point project. Cauthen stated in that memo: "I am sure that you will agree with me that this is a fine piece of work on my part to have negotiated such a deal under this intense pressure in the worst money market anyone can remember. As the market begins to turn, I am confident that we can obtain back-up for our Commitments from investors in the New Jersey area." (Emphasis added) No explanation was offered by appellant at trial as to Cauthen's reference to Commitments in the October 22, 1974 memorandum, although opportunity to explain was offered. Cauthen also sent a memorandum dated March 18, 1975 to Larish that stated, in part: "When we originally issued our permanent loan commitment, we had hoped to provide construction financing, however due to market conditions, and our own shortages of funds, we were unable to come up with an interim loan commitment."Additionally, Larish sent a memorandum dated April 8, 1975 to Chip Stanley, then appellant's capital asset manager, that stated, in part: "They (Coastland) paid $75,000.00 in front end points for our take-out commitment and Grover (Cauthen) indicated to them (Johnson and Cowan) at the time that we would make the construction loan as well. Because we didn't have ready funds to make this deal, Grover convinced them to just take the end mortgage commitment." (Emphasis added) Larish testified that he was merely relating to Stanley what Johnson had informed him Cauthen had done and that at the time he sent the above memo to Stanley he assumed Johnson was correct in his assertions. He further testified that after checking into the matter he determined that Johnson was not correct in his assertion that Cauthen had assured Coastland that appellant would provide it with construction financing. But the district court did not accept this explanation.
 
 
 16
 In this same April 8th memo from Larish to Stanley, Larish further stated: "Would you please have Scott or J.P. dig into this case and acquaint us with all the facts and the genesis of the deal? If it can be solved by us getting a backup take-out commitment now, it might be a way for us to help them (Coastland) and get off the hook at the same time." (Emphasis added) Regarding the quoted language, Larish testified, "The hook I was referring to is: We had when I got with the company over a hundred million dollars of commitments, 88 percent of which were condominium and land development loans. We were on the hook, to use that terminology, for over 50 million dollars of permanent loans on condominiums. We were trying to reduce that potential outstanding." Again, the district court did not accept the explanation.
 
 
 17
 Based, in part, upon the testimony of Johnson and Cowan, which the court characterized as uncontradicted and unchallenged, as well as the above mentioned memoranda, the court determined that there was a binding agreement between the Mortgage Company and Coastland for appellant to furnish construction financing for the first phase of the Schooner Point Condominium project. As previously mentioned, the court awarded Coastland $620,650.00 as damages for the breach of said agreement. The court arrived at the $620,650.00 figure by allowing Coastland to recover one-half of its projected profits on the first phase (71 units) of the project; one-half of the expenses it incurred for architectural, engineering and legal services, as well as other expenses it incurred, in preparation for the construction of the first phase of the project; and the $75,000.00 it paid as a fee for the permanent financing commitment. Additionally, the court ordered appellant to surrender to Coastland the unpaid note for $25,000.00 that constituted the balance of the $100,000.00 fee for the permanent financing commitment.
 
 
 18
 * Appellant contends the district court erred in finding that it made a commitment to provide Coastland with construction financing for the first phase of the Schooner Point Condominium project. This contention is vitiated somewhat by the fact that the Mortgage Company now acknowledges that the district court's fact findings are supported by the record, leaving the definiteness of the terms of the contract and the measure of damages as its essential arguments. In any event, after considering the evidence of record, including the testimony of Johnson and Cowan and the memoranda mentioned above, we do not think the district court erred in finding that the Mortgage Company made a commitment to Coastland to provide it with construction financing. FRCP 52(a).
 
 
 19
 Appellant argues that a construction loan of the magnitude of the one at issue here would not have been so loosely entered into, especially without having been reduced to writing. However, as the Virginia Court stated in Twohy v. Harris, 194 Va. 69, 72 S.E.2d 329, 334-35 (1952), "While there is force to the argument, the fact that the parties did not reduce the agreement to writing was but a circumstance to be weighed . . . in determining whether the agreement was entered into." And, as the Twohy court also stated, the absence of a written memorandum does not, of course, make Johnson's and Cowan's testimony as to the verbal contract incredible.
 
 
 20
 A related contention is the assumption that the Mortgage Company would not have entered into such a construction loan agreement absent an agreement in writing. No writing was executed, however, apparently because of the Mortgage Company's parent company's policy, adopted in June 1974, of not making any commitments for approximately six months. Appellant cites Atlantic Coast Realty Company v. Robertson's Ex'r, 135 Va. 247, 116 S.E. 476, 478 (1923), for the proposition "that when it is shown that the parties intend to reduce a contract to writing this circumstance creates a presumption that no final contract has been entered into, which requires strong evidence to overcome." Assuming that a writing was contemplated, and the district court did not address the point, that case is subject to the qualification stated by the Court in Manss-Owens Co. v. H. S. Owens & Sons, 129 Va. 183, 105 S.E. 543, 547 (1921): "the mere fact that a written contract was contemplated does not necessarily show that no binding agreement had been entered into." The court further stated:
 
 
 21
 "The whole question is one of intention. If the parties are fully agreed, there is a binding contract, notwithstanding the fact that a formal contract is to be prepared and signed; but the parties must be fully agreed and must intend the agreement to be binding. If though fully agreed on the terms of their contract, they do not intend to be bound until a formal contract is prepared, there is no contract, and the circumstance that the parties do intend a formal contract to be drawn up is strong evidence to show they did not intend the previous negotiations to amount to an agreement."
 
 
 22
 Id., citing Boisseau v. Fuller, 96 Va. 45, 30 S.E. 457 (1898).
 
 
 23
 In the instant case, we think the evidence of record supports the district court's finding that a binding verbal commitment was given by appellant to Coastland to provide it with construction financing for the first phase of the Schooner Point project, and that any presumption to the contrary was overcome. We do not think the district court was clearly erroneous in its finding that appellant intended to be bound by its verbal commitment made through Cauthen. FRCP 52(a).
 
 II
 
 24
 Appellant's primary contention with regard to the existence of a binding agreement is that, even if a commitment was given to Coastland to provide it with construction financing, the terms of the agreement were so incomplete and uncertain so as to render such agreement unenforceable. It argues that a typical construction loan commitment would contain the following terms: amount of the loan; limitation of principal amount; term of the loan; options to extend; interest rate; computation of interest; prepayment penalties; identification of contractors and location of construction; closing agent; loan servicing arrangements; title insurance; construction performance bonds; architectural specifications to be complied with; filing responsibilities; collateral documents to be prepared; provisions for payment of expenses incurred; commitment fee; provisions for the release of individual units when sold; the manner of making disbursements; and special conditions. It contrasts the terms of the construction financing commitment as testified to by Cowan, i. e., amount $2,200,000.00; term of the loan 18 months; interest rate 41/2 percent over an unspecified prime rate; and commitment fee $20,000.00 to $40,000.00, with the above enumerated terms purportedly contained in a typical construction loan commitment, and argues that the construction financing commitment in issue here is too incomplete and uncertain to be enforceable.
 
 
 25
 Appellant relies upon Progressive Construction Co. v. Thumm, 209 Va. 24, 161 S.E.2d 687, 691 (1968), in which the court stated:"It is fundamental that no person may be subjected by law to a contractual obligation, unless the character of the obligation is definitely fixed by an express or implied agreement of the parties. In order to be binding, an agreement must be definite and certain as to its terms and requirements; it must identify the subject matter and spell out the essential commitments and agreements with respect thereto. * * * "
 
 
 26
 See also Parker v. Murphy, 152 Va. 173, 146 S.E. 254, 257 (1929), and Smith v. Farrell, 199 Va. 121, 98 S.E.2d 3, 7 (1957).
 
 
 27
 While it is true that a contract to be valid and enforceable must be complete and definite in its terms, "reasonable certainty is all that is required." Smith v. Farrell, 199 Va. 121, 98 S.E.2d 3, 7 (1957). For, "(t)he law does not favor declaring contracts void for indefiniteness and uncertainty, and leans against a construction which has that tendency. While courts cannot make contracts for the parties, neither will they permit parties to be released from the obligations which they have assumed if this can be ascertained with reasonable certainty from language used, in the light of all the surrounding circumstances." High Knob, Inc. v. Allen, 205 Va. 503, 138 S.E.2d 49, 53 (1964). See also McDaniel v. Daves, 139 Va. 178, 123 S.E. 663, 666 (1924). Additionally,
 
 
 28
 'Where the relief sought is specific execution, it is essential that the contract itself should be specific. In other words, the certainty required must extend to all the particulars essential to the enforcement of the contract. But where there has been an entire breach, and compensation is asked in damages, it may be sufficient if there be certainty only as to the general scope and stipulations of the contract.'
 
 
 29
 Manss-Owens Co. v. H. S. Owens & Son, 129 Va. 183, 105 S.E. 543, 547 (1921). See also McDaniel, 123 S.E. at 666.
 
 
 30
 In the instant case, Coastland brought suit against appellant for damages, not specific performance. Accordingly, it is sufficient if there is certainty as to the "general scope and stipulations of the contract." Manss-Owens, 105 S.E. at 547.
 
 
 31
 When the construction financing commitment is construed in the light of the surrounding circumstances, we do not think the court below erred in finding that it was sufficiently complete and definite to be valid and enforceable. Johnson testified that Cauthen informed him that he had worked out the details of the loan with Cowan. Cowan testified that the loan was to be in the amount of $2.2 million at 41/2 percent over the prime interest rate, and that the loan was to be available for up to eighteen months.[5] Cowan also testified that Coastland agreed to pay a fee of $20,000.00 to $40,000.00 for the construction financing commitment. Appellant introduced no evidence to show that the terms of the alleged agreement were different than those testified to by Cowan. In light of the fact this is a suit for damages and not specific performance, we think the terms testified to by Cowan were sufficiently complete and definite so as to render the construction financing commitment valid and enforceable.
 
 III
 
 32
 Appellant also contests the district court's award of damages for the breach of its commitment to provide Coastland with construction financing. Appellant contends the court erred as a matter of law in allowing Coastland to recover one-half of its projected profits on the first phase (71 units) of the Schooner Point project.
 
 
 33
 In allowing Coastland to recover one-half of its projected profits on the seventy-one units, the court recited the general rule of damages that, "(w)hen there has been a breach of a contract to lend money for a particular purpose, profits reasonably within the contemplation of the defaulting parties at the time the contract was made and which are lost by reason of the breach may be recovered, if capable of reasonable ascertainment." Determining that profits were reasonably within the contemplation of appellant at the time the construction financing commitment was given and that the projected profits were capable of reasonable ascertainment, the court awarded Coastland $482,750.00 in lost profits, such amount constituting one-half of Coastland's projected profits on the seventy-one units.
 
 
 34
 Although the rule as above stated may be the general rule, it has a corollary that distinguishes between the recovery of lost profits when an established business is involved and the recovery of lost profits when a new business, venture, or enterprise, or one merely in contemplation, is involved. In Virginia, as in most other jurisdictions:
 
 
 35
 When an established business, with an established earning capacity, is interrupted and there is no other practical way to estimate the damages thereby caused, evidence of the prior and subsequent record of the business has been held admissible to permit an intelligent and probable estimate of damages. . . . But where a new business or enterprise is involved, the rule is not applicable for the reason that such a business is a speculative venture, the successful operation of which depends upon future bargains, the status of the market, and too many other contingencies to furnish a safeguard in fixing the measure of damages.
 
 
 36
 Mullen v. Brantley, 213 Va. 765, 195 S.E.2d 696, 699-70 (1973). To the same effect are Kay Advertising Co. v. Olde London Transportation Co., 216 Va. 273, 217 S.E.2d 876, 878 (1975); Pennsylvania State Shopping Plazas, Inc. v. Olive, 202 Va. 862, 120 S.E.2d 372, 377 (1961); Sinclair Refining Co. v. Hamilton & Dotson, 164 Va. 203, 178 S.E. 777, 780 (1935).
 
 
 37
 Thus, "where the business which is interfered with or prevented as a result of a breach of contract is a new or unestablished nonindustrial business, or one merely in contemplation, the anticipated profits from such business cannot be recovered, for the reason that it cannot be rendered certain that there would have been any profits at all from the conduct of such business." Sinclair Refining Co. v. Hamilton & Dotson, 164 Va. 203, 178 S.E. 777, 780 (1935).
 
 
 38
 In Pennsylvania State Shopping Plazas, Inc. v. Olive, 202 Va. 862, 120 S.E.2d 372 (1961), the court reversed a jury's award of damages because the jury wrongfully considered loss of anticipated profits in arriving at its award. Plaintiff had brought suit for a breach of contract that involved the lease of a service station yet to be constructed. Evidence was offered by plaintiff and others on anticipated profits from the station's operation. Although plaintiff was an experienced service station operator who successfully operated some fourteen service stations, the court held that anticipated profits based on the estimated number of gallons of gasoline that would be sold at the intended new service station site were not recoverable. The court stated:
 
 
 39
 Such estimates cannot be made with any degree of certainty for a new business, since they are purely speculative and existing only in anticipation. The successful operation of a gasoline filling station business depends upon many factors, such as the personality of the operator and the service rendered by him and his employees, the popularity of the brand of gasoline sold, the condition of the market, and many other contingencies.
 
 
 40
 Id. 120 S.E.2d at 378. Thus, the court held plaintiff's proper measure of damages was the value of the lease in excess of the agreed rent for the term and any expenses or costs which the plaintiff may have reasonably incurred under the contract.
 
 
 41
 And, in Mullen v. Brantley, 213 Va. 765, 195 S.E.2d 696 (1973), the court again reversed an award of damages that included anticipated profits from the contemplated operation of a Shakey's Pizza Parlor, despite the fact plaintiff was a successful franchise operator. The court stated:
 
 
 42
 In the present case it was impossible to determine the profit, if any, Mullen would have derived from the operation of a Shakey's Pizza Parlor if he had established it on or near the Duke Street site . . . . Even though Shakey's Pizza Parlors are a part of a national chain, the establishment of such a pizza parlor at or near the Duke Street site would nevertheless have been a new business. The profits derived from the Annandale, Hybla Valley and Rockville franchises and the national average of all Shakey's Pizza Parlors, do not represent a reasonable basis upon which to judge with any degree of reasonable certainty what the profits would have been if Mullen had operated a Shakey's Pizza Parlor at the Duke Street site. The amount of business Mullen would have had at the Duke Street site, and the anticipated profits therefrom, could have been based only on speculation and conjecture.
 
 
 43
 We hold that Mullen's proper measure of damages could not be based on loss of anticipated profits from an unestablished business.
 
 
 44
 Id. 195 S.E.2d at 700.
 
 
 45
 In the instant case, there is no doubt but that the Schooner Point Condominium project was a new venture or enterprise. Although Coastland has been in business since 1970, the Schooner Point project constituted a new endeavor. See Mullen and Pennsylvania State Shopping Plazas, supra. Consequently, the profits Coastland anticipated could only have been based upon speculation and conjecture. This is so because such business is an adventure, the successful operation of which depends upon future bargains, states of the market, and on too many other contingencies.
 
 
 46
 Coastland has not attempted to distinguish the new business line of cases from the case at hand. Rather, Coastland argues, based on the general rule of damages, that since appellant was given documentation that included Coastland's projected profits on the seventy-one units, appellant was aware of Coastland's potential profits and therefore should be liable in damages for the loss of those potential profits.
 
 
 47
 As the cases set forth above point out, there is a corollary to the general rule of damages that may be summarized as follows: When the business that is interfered with as a result of a breach of contract is a new business or venture, or one merely in contemplation, the anticipated profits from such business, cannot be recovered as an item of damages because it cannot be rendered reasonably certain that there would have been any profits at all from the conduct of the business. The fact Coastland supplied appellant with documentation that included Coastland's projected profits on the seventy-one units does not make it certain that there would have been any profits at all from the sale of the seventy-one units. Accordingly, the district court's award to Coastland of one-half of its anticipated profits on the sale of the seventy-one units is reversed.
 
 IV
 
 48
 Appellant also contends that the balance of the court's damage award was arbitrary and capricious. Its primary contention is that the court erred in including as an element of damages one-half of the architectural, engineering and attorneys' fees incurred by Coastland prior to the time the construction financing commitment was given. Appellant also asserts that the court's inclusion of the permanent financing commitment fee as an element of the damage award was erroneous. We disagree.
 
 
 49
 A portion of the architectural, engineering, legal and other expenses incurred by Coastland in preparation for the construction of the project was incurred prior to the time appellant agreed to provide Coastland with construction financing. Appellant argues that such expenses were not properly included as an element of damages for breach of contract since those expenditures were not made in reliance upon the contract.
 
 
 50
 "(O)ne injured by the breach of a contract to which he is a party is entitled to recover special damages which arise from circumstances peculiar to the particular case, where those circumstances were communicated to, or known by, the other party at the time the contract was made; that is, he may recover such damages as are the reasonable and natural consequences of the breach under the circumstances so disclosed and as may reasonably be supposed to have been in the contemplation of both parties."
 
 
 51
 22 Am.Jur.2d, Damages § 59, at p. 90. See also 22 Am.Jr.2d, Damages § 69, at pp. 103-04. As previously mentioned, in the instant case, appellant was provided with documentation at the time Coastland applied for construction and permanent financing that included Coastland's expected total expenditures for architectural, engineering and legal services, as well as other expenses, for the construction of the Schooner Point Condominium project. Consequently, appellant was aware that those expenses were or would be incurred by Coastland and, further, that a breach of its commitment to provide the construction financing might cause Coastland to suffer damages in the amount expended for such services. Without contradiction, and prior to the time such financing became generally unavailable, Coastland rejected offers by others to provide construction financing after the commitment from the Mortgage Company was made. In light of the above, we do not think the district court erred in including expenditures made by Coastland prior to the time the construction financing commitment was given when awarding Coastland one-half of the expenses it incurred in preparation for the construction of the project as damages for the breach of said commitment.
 
 
 52
 Appellant also contends the district court erred in including the fee for the permanent financing commitment in its award of damages for the breach of the commitment to provide construction financing because appellant never breached its commitment to provide the permanent financing and, in fact, remained ready to provide such financing through the termination date of the commitment. Appellant argues it earned the fee upon the making of the commitment and holding the commitment open through its term.
 
 
 53
 The evidence of record shows that Coastland went to appellant seeking both construction and permanent financing. The evidence is that the permanent financing was of no value to Coastland without the construction financing. Additionally, both Johnson and Cowan testified that after appellant informed them that the funding for the construction financing commitment would not be immediately available, Coastland attempted to secure construction financing elsewhere, but was unsuccessful because of the then existing tight banking situation. Appellant's breach of its commitment to provide Coastland with construction financing, in conjunction with Coastland's inability to obtain construction financing elsewhere, did, in a very real sense, render the permanent financing commitment worthless. Accordingly, we are of opinion the district court did not err in including the fee Coastland paid for the permanent financing commitment as an element of Coastland's damages for appellant's breach of its commitment to provide construction financing.
 
 
 54
 In sum, aside from the court's award to Coastland of one-half of its projected profits on the sale of seventy-one units, we find no merit in appellant's contentions that the court acted arbitrarily or capriciously, or erroneously as a matter of law, in its award of damages.
 
 V
 
 55
 Coastland has filed a cross-appeal to the district court's award of damages. It contends that the court erred in awarding Coastland only one-half of the architectural, engineering, legal and other expenses it incurred in preparation for the construction of the Schooner Point project, and in not awarding Coastland interest on the $75,000.00 it paid to appellant as part of the fee for the permanent financing commitment.[6] We think Coastland's contentions are without merit.
 
 
 56
 "When, as in the present case, a defendant is liable for some damages for breach of contract and no evidence is available to show the exact amount, the quantum may be fixed when the facts and circumstances are such as to permit an intelligent and probable estimate thereof." M&B Construction Co. v. Mitchell, 213 Va. 755, 759, 195 S.E.2d 873, 877 (1973). When describing the total expenses Coastland incurred in preparation for the construction of the project, the court noted that "probably some of the information may yet be used." It then concluded that considering all of the facts and circumstances in the case, Coastland should be awarded one-half of its expenses as an item of appellant's breach of contract. As we do not think the court erred in this regard, we do not think the court abused its discretion in concluding that on the facts of this case Coastland should only recover one-half of its total expenses.
 
 
 57
 Likewise without merit is Coastland's assertion that the court erred in not awarding it interest on the $75,000.00 that Coastland paid to appellant for the permanent financing commitment. So far as is relevant to this case, whether to allow Coastland interest on the $75,000.00 was in the sound discretion of the district court. Va.Code § 8.01-382. See Doyle & Russell, Inc. v. Welch Pile Driving Corp., 213 Va. 698, 194 S.E.2d 719, 723 (1973) (interpreting a predecessor statute). We think the denial of interest by the district court was well within its discretion.
 
 
 58
 Accordingly, on remand the judgment of the district court will be reduced by $482,750.00, the amount of anticipated profits included therein; otherwise, it is in all respects affirmed.
 
 
 59
 Each side will bear its own costs on appeal.
 
 
 60
 AFFIRMED IN PART, REVERSED IN PART, and REMANDED.
 
 
 
 *
 United States District Court for the Western District of Pennsylvania, at Pittsburgh
 
 
 [1]
 Initially, the Mortgage Company also contended that the district court erred in its determination that Virginia's Statute of Frauds did not apply and in its admission of parol evidence to prove the existence, conditions and terms of the alleged commitment. However, these contentions were abandoned
 
 
 [2]
 Johnson and Cowan also testified that during said telephone conversation Cauthen stated that appellant would have no objections if Coastland wanted to try and obtain construction financing elsewhere since appellant could not fund the project immediately. Both Johnson and Cowan testified that Coastland did seek financing elsewhere, but that because of the then existing tight banking situation such financing could not be obtained
 
 
 [3]
 Prior to the institution of this suit, no effort was made by appellant to collect this $25,000.00 promissory note, although it was past due
 
 
 [4]
 Cowan testified that in early 1975 Coastland requested another extension of the termination date for the permanent financing commitment, but never received a response from appellant to its request
 
 
 [5]
 In its brief, appellant states that, "(a)ccording to Johnson the term of the construction loan was 'probably' to be two years." It makes much of this claimed aspect of Johnson's testimony as evidence that the terms of the commitment were too indefinite to be enforceable since Cowan had testified that the construction financing was to be available for up to eighteen months. Appellant's characterization of Johnson's testimony, however, is not correct. Johnson testified that construction financing for the whole project (134 units) probably would have been for approximately two years. Cowan testified that under the commitment given by appellant construction financing would be available for up to eighteen months. The financing Cowan was referring to was for seventy-one units, the first phase of the project, and not for the whole project (134 units)
 
 
 [6]
 Coastland also contends the court erred in awarding it only one-half of its projected profits. Because we have concluded that no anticipated lost profits were recoverable in this case, we need not address this contention