**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SCHEDULED AIRLINES TRAFFIC
OFFICES, INCORPORATED,
Plaintiff-Appellee,

v.

OBJECTIVE: INCORPORATED,
Defendant-Appellant.

No. 97-2713

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-97-265-A)

Argued: January 26, 1999

Decided: June 14, 1999

Before WIDENER, MURNAGHAN, and HAMILTON,
Circuit Judges.

_____

Affirmed by published opinion. Judge Murnaghan wrote the opinion,
in which Judge Widener and Judge Hamilton joined.

_____

**COUNSEL**

**ARGUED:** Robert Matthew Beckman, BODE & BECKMAN,
L.L.P., Washington, D.C., for Appellant. Jonathan S. Feld, BRAND,
LOWELL & RYAN, P.C., Washington, D.C., for Appellee. **ON
BRIEF:** Sheri M. Lyons, Daniel S. Heyneman, Jacquelyn Gluck,
BODE & BECKMAN, L.L.P., Washington, D.C., for Appellant. Ross

A. Nabatoff, BRAND, LOWELL & RYAN, P.C., Washington, D.C., for Appellee.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Scheduled Airlines Traffic Offices, Inc. ("SATO") and Objective: Inc. ("Objective") agreed to produce a travel software system together. After Objective ceased work on the project, SATO filed a complaint for breach of contract and breach of warranty against Objective. Objective filed an answer and six counterclaims. The district court granted SATO's motion for summary judgment on four of the six counterclaims -- namely, the claims alleging defamation, violations of the Lanham Act, breach of fiduciary duty, and misappropriation of trade secrets. After the jury trial, the court granted Objective's motion to dismiss SATO's breach of warranty claim, as well as SATO's motion for judgment as a matter of law on Objective's two remaining counterclaims, breach of contract and fraud in the inducement of the contract. On SATO's remaining breach of contract claim, the jury found in favor of SATO and awarded the company $1.00 in damages. On appeal, Objective challenges the court's grant of summary judgment and judgment as a matter of law against all its counterclaims.

I.

Appellee SATO, a Delaware corporation whose corporate headquarters are located in Arlington, Virginia, provides travel management services. Before 1994, SATO provided travel services only to government agencies. In April 1994, SATO set out to expand its business to include travel services for private sector companies. SATO envisioned a custom software system that would assist in providing travel management services to its prospective private sector customers. The software system, dubbed Eagleware, would be installed on the desktop computers of SATO travel agents at a reservation call center. A second software system, Navigator, would be used by individual travelers to make travel arrangements directly from their own personal or office computer.

2

To develop the software systems, SATO considered proposals from several outside firms. In March 1994, Objective's President and Chief Executive Officer, Bernadette Reiter, submitted a proposal to SATO recommending use of an Objective software programming tool called Macroscope to produce the Eagleware and Navigator Systems. Objective offered a fixed-price contract of $900,000 to complete all the work.

In May 1994, SATO entered into a Software and Development Support Agreement ("Agreement") with Objective to develop the custom software. Under the Agreement, Objective assigned to SATO all of its "proprietary rights in and to the [Software] System and all `System Updates' and `System Enhancements.'" Objective also granted SATO "the right and license to use, reproduce, sublicense, prepare derivative works, distribute copies, publicly perform and display such Proprietary Components for use in connection with the System." Finally, the Agreement was the complete contractual agreement of the parties. As the terms of the contract make clear, it"supersede[d] all prior oral or written agreements, commitments or understandings with respect to the matters provided for [therein]." Objective signed the Agreement on May 12, 1994, and SATO signed days later.

In July 1994, SATO requested that Objective prepare a simulation of the software systems under development for use at an annual travel industry convention to be held the following month. The simulation was to demonstrate how the travel call center would work when the software was completed. Objective requested an additional $200,000 for its work assisting SATO on the demonstration units, which SATO agreed to and paid.

Having failed to complete the Eagleware and Navigator Systems by the targeted deadline of January 31, 1995, presumably in part due to its work on the simulation, Objective committed to a completion date of May 31, 1995. Objective tested the software components in May 1995 and uncovered significant problems that made the software inoperable. Despite the problems, Objective's management directed its employees to stop programming and vacate the project as of May 31, 1995. At the time of Objective's departure from the project, the Eagleware System was incomplete, and no programming work had

3

been done on the Navigator System. Objective had, however, received full payment from SATO.

In a letter dated May 31, 1995, SATO specifically notified Objective that its work had not been completed. SATO emphasized that Objective remained "obligated under the Software Development and Support Agreement (the Agreement) to develop, deliver, install and test an Eagleware System which operates in accordance with the Detail Design." SATO complained that "Objective [was] withdrawing its development team prior to development being completed." As a result of the software defects, SATO never used the Objective-programmed Eagleware software. Instead, SATO constructed its own Eagleware System using a different programming tool called Power-builder.

On February 24, 1997, SATO filed a complaint for breach of contract and breach of warranty against Objective. On March 17, 1997, Objective filed an answer and counterclaim. In response to SATO's motion to dismiss, Objective filed an amended answer and six-count amended counterclaim. On September 5, 1997, the district court granted SATO's motion for summary judgment on four of Objective's six amended counterclaims. Specifically, the court granted summary judgment to SATO on the counterclaims for defamation, Lanham Act violations, breach of fiduciary duty, and misappropriation of trade secrets. The court denied SATO's motion for summary judgment on Objective's counterclaims for breach of contract and fraud in the inducement of the contract.

On October 27, 1997, a jury trial commenced. The court denied Objective's motion for judgment as a matter of law on SATO's breach of contract claim, finding that there was ample evidence to proceed, and granted Objective's motion to dismiss the breach of warranty claim. At the close of evidence, the court granted SATO's motion for judgment as a matter of law on Objective's breach of contract and fraud in the inducement of the contract counterclaims. On October 30, 1997, the jury found in favor of SATO on its breach of contract claim and awarded $1.00 in damages. Accordingly, the court entered an Order to this effect, from which Objective now appeals.

4

II.

A. Judgment as a Matter of Law Against Objective's Counterclaim
     for Breach of Contract

At the close of evidence, the district court entered judgment as a matter of law against Objective's breach of contract counterclaim, determining that the claim only sought damages for future projected profits which Virginia law prohibited.[1] We review a district court's grant of judgment as a matter of law de novo. See Benesh v. Amphenol Corp., 52 F.3d 499, 502 (4th Cir. 1995). On review, the facts are viewed and inferences are drawn in a light most favorable to the nonmoving party. See Singer v. Duncan, 45 F.3d 823, 827 (4th Cir. 1995). Judgment as a matter of law is proper only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Singer, 45 F.3d at 826.

Under Virginia law, a loss of anticipated profits from an unestablished business cannot be a proper measure of damages. See Mullen v. Brantley, 195 S.E.2d 696, 700 (Va. 1973). The Supreme Court of Virginia determined in Mullen that "such a business is a speculative venture, the successful operation of which depends upon future bargains, the status of the market, and too many other contingencies to furnish a safeguard in fixing the measure of damages." Id. at 700. Appellant Objective argues that the district court misapplied the Mullen rule. Noting that there is no evidence that its custom software project for SATO is an essentially different business from its prior custom software projects, Appellant maintains that it is an ongoing business so, under Goldstein v. Kaestner, 413 S.E.2d 347, 350 (Va. 1992) (holding that even though there was a change in ownership of supermarket, the day-to-day operations remained the same, so lost profits were recoverable), the jury should have been allowed to make a reasonable estimate of lost future profits.[2]

_____

[1] The Agreement provides that the laws of the Commonwealth of Virginia will govern any claims or disputes arising under the contract.
[2] Objective also insists that it is seeking damages beyond mere lost future profits. On appeal, Objective maintains that it is entitled to damages for "being put out of business" and $40,000 annually for software support services after the warranty period expired. The record indicates, however, that at trial Objective only submitted evidence of potential future profits.

5

To the contrary, the Virginia Supreme Court in Goldstein determined that the plaintiff was entitled to lost profits only after it concluded that the predecessor store was "nearly identical" to its successor. 413 S.E.2d at 350. The evidence establishing that "the day-to-day operations of the [two stores] were substantially the same" provided a sufficient basis for the jury to estimate lost profits with "reasonable certainty." Id. In the case at bar, however, there is no such basis on which to estimate damages. The software product was newly developed, so there was no predecessor product on which to predicate a reasonably certain estimate of lost profits. Rather, any estimate would be rooted in speculation and conjecture, both of which constitute improper grounds for damages under Virginia law. See id. at 349; Mullen, 195 S.E.2d at 700 (denying damages for lost profits where "the anticipated profits ... could have been based only on speculation and conjecture"); see also LaVay Corp. v. Dominion Federal Savings & Loan Association, 830 F.2d 522, 529 (4th Cir. 1987) ("Damages may not be awarded ... where an award would be based on an estimate of lost profits which is speculative."), cert. denied, 484 U.S. 1065 (1988).

It does not matter that Objective may have produced other custom software previously. See Mullen, 195 S.E.2d at 698, 700 (denying damage award for lost profits even where plaintiff had operated other franchises of same restaurant); Pennsylvania State Shopping Plazas, Inc. v. Olive, 120 S.E.2d 372, 375, 377-78 (Va. 1961) (setting aside damage award for lost profits from unconstructed service station even where plaintiff operated fourteen other service stations); see also Coastland Corp. v. Third National Mortgage Co., 611 F.2d 969, 978 (4th Cir. 1979) (denying damage award based on projected profits from sales of condominium units even where plaintiff had been in real estate development business for at least four years). The new software project was a new endeavor, as evidenced by the testimony of Objective's president who stated that "the type of technolog[y] ... had never been done before." The project's profitability depended on many factors, including the state of the market and the success of the marketing strategy; the industry's acceptance of SATO's entry into the commercial market, where its clientele had previously been limited to the government; and future negotiations. Indeed, it cannot be certain that there would have been any profits at all. See Coastland, 611 F.2d at 978 (noting that where the business or venture is new, "the antici-

6

pated profits from such business, cannot be recovered as an item of damages because it cannot be rendered reasonably certain that there would have been any profits at all from the conduct of the business"). Accordingly, the district court properly dismissed the breach of contract counterclaim, since Objective only sought uncertain, lost profits from its new venture with SATO. Such damages are not recoverable under Virginia law.

B. <u>Judgment as a Matter of Law Against Objective's Counterclaim for Fraud</u>

Appellant Objective maintains that, in order to induce it to agree to a low, fixed price, SATO indicated that: (1) it was on a limited budget of less than $1 million; (2) Objective would get "very good visibility" from producing the software product; (3) Objective would be identified as the developer and get "hundreds of millions of dollars;" (4) SATO would give Objective lots of exposure if Objective produced a simulation of the software system for exhibition at the industry trade show; and (5) the product and its derivatives would be jointly marketed to third parties, with SATO and Objective dividing the revenue evenly. Objective maintains that it relied on these allegedly fraudulent representations and suffered substantial damages as a result. The district court disagreed and, at the close of evidence, entered judgment as a matter of law against Objective. The court observed that Objective's allegations "really amount to nothing more as a matter of law, than the negotiations for entry into this contract."

Under Virginia law, "fraudulent inducement to perform may arise when one party induces the other to perform by concealing some fact which excuses performance by the latter." <u>Ware v. Scott</u>, 257 S.E.2d 855, 857 (Va. 1979). With this standard in mind and assuming the veracity of Objective's claims, even if SATO had revealed that their budget for the software project was unlimited, that fact would not excuse Objective's performance of its contractual obligations. Informed of certain budgetary constraints, Objective was free to accept or decline the project based on its own ability to produce the desired product. It opted to accept the project and proposed terms that included a low, fixed price for its services. There was no fraudulent inducement, as contemplated by the Virginia Supreme Court in <u>Ware</u>.

7

Furthermore, trial and deposition testimony established that the simulation at the trade show displayed Objective's logo, as Objective designed it. There is no indication from the record that SATO promised anything more to Objective. Any statements that Objective would receive "enormous exposure" or "very good visibility" from producing the simulation or the software systems were expressions of opinion that, as a matter of law, cannot form the basis for fraud. See Watson v. Avon Street Business Center, Inc., 311 S.E.2d 795, 798 (Va. 1984) (holding that statement by sellers' agent that warehouse had "a good roof" was an expression of opinion insufficient to constitute fraud). Our conclusion is buttressed by the fact that the record reflects no agreement or discussion as to how SATO would ensure the "enormous exposure" or "very good visibility." There was no misrepresentation of a material fact and, thus, no fraud.

Finally, Objective's claim that it had an oral agreement with SATO to market the software jointly and divide the revenue evenly is contradicted by the express language of the Agreement. The Agreement provides:

> Promptly following the execution of this Agreement, the parties shall commence negotiations regarding a mutually acceptable marketing arrangement that would grant Developer [Objective] the non-exclusive right to sublicense the System to Third Parties on terms and conditions which would be agreed to by the parties.

The Agreement further provides:

> This Agreement ... constitutes the entire agreement between the parties hereto with respect to the transactions contemplated herein, and it supersedes all prior oral or written agreements, commitments or understandings with respect to the matters provided for herein.

Even if the parties had agreed to market the software jointly and share the revenue, any discussion is superseded by the written contract that both parties signed. While the Agreement does call for the commencement of "negotiations [between the parties] regarding a mutually acceptable marketing arrangement," since neither SATO nor

8

Objective attempted to initiate such negotiations, **3** it would be inappropriate to label SATO's inaction fraudulent.

Viewing the facts in the light most favorable to Objective, there is no evidence in the record on which a reasonable jury could find that SATO committed fraud. The district court, therefore, properly granted judgment as a matter of law against Objective's counterclaim.

C. Summary Judgment Against Objective's Lanham Act Counterclaim

Objective argues that SATO misrepresented to prospective customers that it developed the software that Objective authored, in violation of the Lanham Act, 15 U.S.C.A. § 1125(a) (West 1998). The relevant statutory provision provides as follows:

> (a) Civil action
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

_____

**3** Objective's president, Bernadette Reiter, did state in a written declaration that SATO refused to negotiate, but she later conceded on cross-examination that Objective never attempted to initiate any negotiations.

9

> shall be liable in a civil action by any person who believes
> that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125(a)(1). The district court rejected Objective's claim and granted SATO's motion for summary judgment, finding that SATO "did not pass off [Objective's] product as its own, nor did it unlawfully conceal defendant's identity." We review a district court's grant of summary judgment de novo. See Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996). The facts are viewed and inferences are drawn in a light most favorable to the nonmoving party. See id. at 961. Summary judgment should be granted only when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Id. at 958.

Objective maintains that there was sufficient evidence to raise a genuine issue as to whether SATO misrepresented Objective's software system as its own at the 1994 trade show and in discussions with a prospective customer. Objective points to the deposition of SATO's Chief Operating Officer, Scott Kellar, who testified that Objective's name was not on SATO's booth at the trade show and that the first computer screen read "SATO Travel." Objective also argues that in a proposal made by SATO in February 1995 to a prospective customer, Qualcomm, Inc. ("Qualcomm"), SATO falsely represented that the two versions of Objective's system were developed in-house by SATO's Information Technology Division.

To support its contention, Objective relies on Smith v. Montoro, 648 F.2d 602 (9th Cir. 1981), in which the name of an actor in a movie was replaced with another name in the credits. The Ninth Circuit held that the name substitution, or "reverse passing off,"**4** violated the Lanham Act. The court noted that the victim of "reverse passing off" is "involuntarily deprived of the advertising value of its name and

_____

**4** "Reverse passing off" occurs expressly "when the wrongdoer removes the name or trademark on another party's product and sells that product under a name chosen by the wrongdoer." Smith , 648 F.2d at 605. "`Implied' reverse passing off occurs when the wrongdoer... removes or otherwise obliterates the name of the manufacturer or source and sells the product in an unbranded state." Id.

10

of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product." Id. at 607. Appellant's reliance on Smith is misplaced, however, since in the present case, there is no allegation that SATO removed Objective's name or trademark from the software.[5] Indeed, the evidence demonstrated that Objective designed the simulation to display Objective's name and logo before the SATO name, which it did. There was no attempt by SATO to misbrand or misrepresent the product. To the contrary, the program operated just as Objective intended.

Regarding SATO's proposal to Qualcomm, the language at issue merely states that the company "employs systems analysts and programmers who assist" in developing certain software. The proposal further states that SATO has "two automated reservations products under development" and briefly describes each. The proposal does not constitute an attempt by SATO to misappropriate Objective's work product. Indeed, the statements were true. Objective's programmers were employed by SATO and assisted in the development of at least one of the software systems. Furthermore, under the terms of the Agreement, SATO had been granted all rights to the software so did, in fact, own the "products under development." Under such circumstances, there can be no false or misleading representation. We, therefore, find that Objective has not stated a valid claim for relief under § 1125(a) of the Lanham Act.

D. Summary Judgment Against Objective's Counterclaim for Theft of Trade Secrets

The district court granted summary judgment against Objective's counterclaim for theft of trade secrets, finding that Objective granted SATO unrestricted permission to use Objective's software system. Objective argues that the district court overlooked words in the

_____

**5** As a threshold matter and as we point out below, it is doubtful that Objective has a legitimate interest protected by the Lanham Act, since Objective granted ownership and all rights to the software to SATO under the terms of the Agreement. See generally Smith, 648 F.2d at 608 (noting that the "dispositive question" in determining standing under § 1125(a) is whether the plaintiff "has a reasonable interest to be protected against false advertising").

11

Agreement that raise a genuine issue as to whether Objective imposed a restriction on use of its trade secrets. Paragraph 2(A) reads:

> Developer hereby grants to Customer, in perpetuity, without any further payment therefore [sic], the right and license to use, reproduce, sublicense, prepare derivative works, distribute copies, publicly perform and display such Proprietary Components for use in connection with the [software] System.

Objective insists that the court erred in ignoring the restriction on SATO's use of Objective's trade secrets to "use in connection with" Objective's software system. Because SATO modified the software and maintains that it did not use Objective's product, Objective argues that its trade secrets were not used "in connection with the System," as contemplated under the Agreement.

To the contrary, Paragraph 2(B) establishes that SATO owned all the rights to any application with which Objective assisted. Under Paragraph 2(B), Objective made the following assignment to SATO:

> Developer hereby assigns and conveys to Customer all of Developer's proprietary rights in and to the System and all "System Updates" and "System Enhancements" ... including, but not limited to, all material, data, specifications, tapes and programs, either written or readable by machines composed, submitted or interpolated by Developer in connection with the System whether such rights arise by operation of law, or otherwise.

In addition, Objective agreed to "execute whatever documents ... reasonably require[d] to evidence [SATO's] ownership of all patents, copyrights, trademarks and trade secrets in the System, System Updates and System Enhancements." The unambiguous language of the Agreement not only granted SATO the use of any of the software's components, but established SATO's ownership of the trade secrets at issue. Under the terms of the Agreement, there was no misappropriation by SATO. The district court properly granted summary judgment in its favor.

12

E. Summary Judgment Against Objective's Counterclaim for
        Defamation

Objective also claims that language in SATO's annual report is
defamatory. The relevant sections read: "Picking up where an outside
firm left off, Sato Travel programmers spent months modifying and
rewriting software, providing that the in-house computer experts
could handle the job on their own -- and handle it they did." The dis-
trict court determined that the "allegedly defamatory statements, even
if recognized by a knowledgeable person as referring to [Objective],
are no more than [SATO's] attempt at self congratulation and can
hardly bring ridicule and scorn to anyone." We agree.

Objective maintains that the district court exceeded its limited role
at the summary judgment level by determining that the allegedly
defamatory statements could not hold anyone to ridicule and scorn.
Objective argues that the district court, in so doing, applied the test
of defamation per se, when it should have applied the test for defama-
tion per quod. Under the defamation per quod test, "the defamatory
meaning of published words ... may arise by innuendo from the pub-
lished words in combination with known extrinsic facts." Wilder v.
Johnson Publishing Co., Inc., 551 F.Supp. 622, 623 (E.D. Va. 1982).
Objective insists that a reasonable jury could find that SATO'S state-
ment in its annual report is false and defamatory because the refer-
ence would be understood in the software development industry as
referring to Objective and implying that the company disappointed a
customer without justification. As a consequence, Objective main-
tains that it suffered a loss of reputation and standing. See Sateren v.
Montgomery Ward & Co., Inc., 362 S.E.2d 324, 326 (Va. 1987) (indi-
cating that loss of reputation and standing in the community is suffi-
cient for the award of damages in libel suit).

To establish defamatory libel under Virginia law, Objective must
demonstrate that the statement "was intended to refer to [it] and
would be so understood by persons reading it who knew [the com-
pany]." Gazette, Inc. v. Harris, 325 S.E.2d 713, 738, cert. denied,
Fleming v. Moore, 105 S.Ct. 3513 (1985). "[I]f the publication on its
face does not show that it applies to the plaintiff, the publication is
not actionable, unless the allegations and supporting contemporane-
ous facts connect the libelous words to the plaintiff." Id. at 738. In the

13

case at bar, the statement in question does not name Objective, nor does it provide any identifying details that would "lead those who knew or knew of [Objective] to believe that the [report] was intended to refer to [it]." Id. Even if others in the industry knew the statement referred to Objective, however, the company would have no actionable claim since it provides no evidence that the statement is false. The uncontroverted evidence suggests that SATO programmers did modify the software after the relationship between SATO and Objective ended, which is all that the report maintains. See Wilder, 551 F.Supp. at 624-25 (noting that the "defamatory meaning must flow readily from the statement and [the extrinsic facts]. `It is a clear rule of law, that innuendo cannot introduce a broader meaning than that which the words, taken in connection with the [extrinsic facts], would naturally bear.'"). Without demonstrating that the statement was false and that readers believed it referred to Objective, Objective cannot sustain its defamation claim. See Celotex Corp. v. Caterett, 477 U.S. 321, 323 (1986) (noting that party opposing summary judgment must produce evidence establishing every element on which it bears the burden of proof). The district court, therefore, properly granted summary judgment against Objective's claim.

F. Summary Judgment Against Objective's Counterclaim for Breach of Fiduciary Duty

Finally, Objective claims that SATO breached its fiduciary duty arising out of an alleged joint venture between the two companies to market the software systems to third parties. The district court dismissed the claim on summary judgment on the ground that "the alleged joint venture, which would have been a part of, or would have preceded, the actual written Agreement, is precluded by the integration clause in that Agreement." "As a joint venture does not exist," the court continued, "plaintiff does not owe defendant a fiduciary duty arising therefrom."

Objective argues that the court ignored the evidence in the written Agreement that the parties had agreed to form a joint venture and would negotiate the details after executing the written Agreement. As stated above, Paragraph 7 of the Agreement provides that "[p]romptly following the execution of this Agreement, the parties shall commence negotiations regarding a mutually acceptable marketing

14

arrangement that would grant Developer [Objective] the non-exclusive right to sublicense the System to Third Parties on terms and conditions which would be agreed to by the parties." In addition, Bernadette Reiter, Objective's president, testified by written declaration that the two companies agreed to share the proceeds evenly and that further "[d]etails would be negotiated promptly after signature of a formal software development contract, but SATO refused to do so." Objective insists that there is ample evidence on which a reasonable jury could find that a joint venture existed.

However, the language in the Agreement clearly states that after the signing of the contract, the parties "shall commence negotiations" concerning a marketing arrangement. There were only plans to negotiate a marketing arrangement, and on cross-examination, Objective's president conceded that the company never attempted to begin such negotiations. Moreover, any pre-Agreement discussions regarding a joint venture are invalidated by the integration clause in the Agreement, which provides that the Agreement is the entire agreement of the parties and "supersedes all prior oral or written agreements, commitments or understandings ...." See Spotsylvania County School Board v. Seaboard Surety Co., 415 S.E.2d 120, 126 (Va. 1992) (excluding evidence of pre-contract discussions or correspondence based on existence of similar integration clause). It is clear from the unambiguous language of the contract that no joint venture existed, so no fiduciary duty emerged. The district court's grant of summary judgment against Objective's claim is, therefore, justified.

Consequently, we conclude that the judgment should be

AFFIRMED.

15